EARL BLANKENSHIP and EULA BLANKENSHIP v. KANSAS EXPLORATIONS, INC., Appellant.—30. S. W. (2d) 471.

Division One, July 9, 1930.

*Grayston & Grayston* and *Paul E. Bradley* for appellant.

*Grover C. James* and *J. D. James* for respondents.

LINDSAY, C.—This is an action for damages alleged to have been caused by the mining operations of defendant, in running and dumping sludge and debris into the mill pond of plaintiffs whereby, it is charged, the pond was so far filled as to destroy the water power by which plaintiffs had operated a custom or grist mill. The appeal of defendant is from a judgment in favor of plaintiffs in the sum of $10,000.

The plaintiffs, husband and wife, were owners in fee simple of a tract of twenty-four acres of land extending upon both sides of Center Creek, a non-navigable stream in Jasper County. A dam approximately eight feet high and fifty feet long extended across the creek at a point where the creek ran from north to south, and the mill stood on the west bank. The dam and mill were constructed under permission granted in the year 1869, in an *ad quod damnum* proceeding had in the Circuit Court of Jasper County, and the mill erected about that time was operated thereafter by plaintiffs' predecessors and thence forward by plaintiffs who acquired the property in December, 1923, until failure of sufficient water power, caused as is alleged by the act of the defendant. Since the trial of the cause, the husband, Earl Blankenship has died, and the widow, Eula Blankenship, surviving tenant by the entirety, has succeeded to the whole title.

The defendant began its mining operations in February or March, 1925, at a mine known as the Isherwood Mine, and was engaged in the extraction, milling and concentration of lead and zinc ores. Defendant's mine, mill and concentrating plant, are situated upstream from plaintiff's pond, and at a distance of approximately one-half mile therefrom.

The plaintiffs' mill consists of a building about 80 by 97 feet in size, a part of which is three stories in height, and it is equipped with machinery for grinding wheat, corn and other grains, with a

capacity of forty barrels of flour per day, and thirty bushels per hour for cracking corn and making chops. The mill extended over a forebay at the west end of the dam. The forebay is about 29 feet long and 12 feet wide and about 12 feet deep and contains two large water wheels, one for operating a wheat mill and the other for the corn mill. Near the mill is a small dwelling house in which plaintiffs resided, a camp house, frame garage and hen house.

Center Creek is largely fed by springs, and the dam created a pond about one-fourth of a mile in length, which extended upstream from the dam northward for about one-eighth of a mile, thence eastward, and thence southeastward following up Center Creek. The pond, prior to its obstruction, was 50 to 120 feet in width, and from 10 to 16 feet in depth. The evidence was that it afforded abundant water for running the mill, until its obstruction and filling up with sludge and debris from defendant's plant; and plaintiffs had a good business in operating it, and during the two years of their operation of it, made a net profit of $4,000, besides supporting their family.

The defendant's ore-milling plant had a capacity of 250 tons for a ten-hour shift. It was located north and east of plaintiffs' mill—according to the evidence, between a quarter and one-half mile east and a quarter and a half mile north, from plaintiffs' pond. The sludge from defendant's mill was carried into the pond by the flow of water down a valley and along a ditch made by defendant, leading from defendant's plant or sludge pond, over land, spoken of as the Boline land, into Center Creek near the upper end of the plaintiffs' mill pond. On the west side of the creek at a point about one-half mile from the mill dam there is a low place in the bank of the creek, and at this low place there had been constructed an embankment about 60 feet in length, along the edge of the creek, which is referred to as the upper dam, but it did not run across the stream, and was maintained for the purpose of holding the stream in the channel at that place. This so-called upper dam was not on land owned by plaintiffs or their predecessors, but had been maintained and repaired from time to time apparently by consent of the owners of that land.

The plaintiffs first noticed the failure of power, in January, 1926. This suit was filed March 27, 1926. In October, 1926, there were heavy rains, and the rise of the water caused some of the sludge or sediment to be washed out; but also at that time the channel of the creek was changed by a washout near the so-called upper dam. During this high water the mill had power for a few days, but when the water receded the power was gone. Plaintiffs introduced evidence to the effect that when the high water went down, the

pond was virtually empty, and that two-thirds of the area of the pond was filled with sludge, which ran anywhere from a feather edge to eight feet deep.

Further reference will be made to the evidence as occasion requires in the discussion of the questions raised by the appeal. The outstanding contention of defendant is that plaintiffs failed to establish a permanent injury to their property, and this question is related to other questions under the instructions given or refused. Defendant filed a motion in arrest of judgment, on the theory that the facts stated in the petition do not support the verdict and judgment, and are insufficient to constitute a cause of action.

It is first urged that the case was submitted to the jury on the theory of permanent damages; that the petition does not contain any allegation as to the market value of the property before or after the alleged injury and therefore is insufficient to support the verdict.

In passing upon this point it is not necessary to refer extensively to the allegations of the amended petition upon which the cause was tried. After setting forth the acts of defendant, the plaintiffs, in one place, characterize such acts as: "lowering, decreasing and destroying the water power at said milling plant of plaintiffs," and elsewhere is another allegation that the power was "destroyed" by reason of the acts of defendant, and that "the motive power" was lost. It is further alleged in the petition "that by reason of said wrongful acts and conduct of defendant, the said mill-dam, pond and property had become valueless, and by reason thereof plaintiffs have not only suffered the loss of same, but also have lost and will continue to lose profits of $400 per month from the operation of said business;" followed by allegation that plaintiffs have been damaged by reason of defendant's acts in the sum of $20,000. There is the further allegation that the wrongful acts of the defendant were done "willfully and maliciously," and on that account plaintiffs asked punitive damages in the sum of $5,000. Counsel for defendants argue that the logical construction of the petition is that plaintiff sought recovery for lost profits, and that this is manifested by the prayer for punitive damages; and that nevertheless the case was submitted on the theory of permanent injury, which was an unauthorized enlargement of the scope of the cause pleaded. As to the prayer for punitive damages, that, manifestly, relates to the allegation that the acts of the defendant were willfully and maliciously done. From what we have said and from what we have quoted from the petition, it clearly appears there is allegation of the destruction of the power, and that the property had become valueless. This allegation necessarily refers to the value of the property as mill property.

Plaintiffs were not obliged to set forth in their petition the measure of damages. In St. Louis Trust Co. v. Bambrick, 149 Mo. 560, a similar objection was made to the petition, that it did not charge the permanent injury to be the difference in the value of the land just prior and just subsequent to the overflow, nor charge the temporary injury to be the rental value from the date of the overflow to the commencement of the suit. It was held that no such allegations were necessary. It was said: "It is not necessary that it should allege what the measure of damages was, as that was a matter to be regulated by the court in its instructions to the jury." Counsel for defendant have called attention upon this point to Sidway v. American Land & Live Stock Co., 163 Mo. 342. That was a case in which a petition was held insufficient where recovery was sought for services rendered during a long period of time, and under varying and complicated conditions, and it was held that the allegations were too indefinite and uncertain. In the case at bar the petition does not use the word "permanent," but it does describe what defendant did, and alleges as the result, destruction or loss of power, and that the mill-dam and property became valueless. It must be regarded as sufficient, and especially so against an objection made after verdict. This assignment is overruled.

It is next contended that the evidence failed to establish any permanent injury to plaintiffs' property and that plaintiffs were not entitled to recover all damages in one action. Plaintiffs' evidence is to the effect that the cause of the diminished flow of water and subsequent loss of power was discovered  when, and not before the power actually failed, and that the actual failure of the power was the occasion of the inquiry into the cause of the failure, and of the discovery that the pond had been so far filled with sludge that it no longer furnished power to run the mill, or to run it efficiently. This discovery was made in January, 1926. The plaintiffs notified defendant of the effect of what had been done, but in fact the flow of sludge into the pond continued until the following May. Plaintiffs' witnesses described the condition of the pond in various ways: "It was very near filled plum up;" that "on an average for the quarter of a mile it wouldn't average over a foot deep where it had been 12 to 16 feet deep along there." One spoke of seeing sludge "stacked up out of the water where the water before was something like 14 feet deep." A witness said: "When I first began to go down around the mill it was pretty deep, 12 feet or more, I expect. Since this sludge has been running in it would be about three or four feet deep now since that sludge carried in on the sides; where the water forced

through in the middle when the gates was open it has a deep cut through the center; have seen the pond after it was emptied of water; I seen lots of sludge in there then, caked in and great gobs of it; it would be from three to four feet thick; that would be true along the sides; I didn't get out in the center." Other testimony was that the sludge got into the forebay and on the wheels; that the filling in of the pond with sludge changed the course of the water, and did not let the water go into the forebay. No one undertook to estimate what would be the cost of cleaning the mill-pond of sludge. One of the plaintiffs' witnesses who said he had had some experience in cleaning sludge ponds—the same being ponds made by mine operators, for the deposit of sludge—described the work of cleaning a sludge pond as an "awful job," and said the mill-pond would have to be cleaned by use of a dredge; that he had no way of estimating how long it would take, or how much it would cost; that it was "too much of a job for him to figure;" that if the sludge was taken out and put on the banks of the creek on plaintiffs' property, it would wash back in times of high water." The same witness was asked on his further cross-examination whether if the dam had been opened when the trouble was discovered, and the water turned through, the sludge could have been drained out. He answered that if the dam had been cut, and the water allowed to run through when the sludge was first put there, it would have "run the most of it out, it would have leveled the bottom," but that it would have been necessary to shut the mill down while the dam was cut; that "without a flood, with a normal creek running down there, it would take it a year to run out." Some of plaintiffs' witnesses had taken out some of the sludge and weighed it to compare it with ordinary dirt. They testified that a gallon of sludge weighed sixteen pounds and a gallon of ordinary dirt nine pounds.

It is to be observed here that the deposit of the sludge created a condition which did not cause an occasional damage, such as would arise from an obstruction of the flow of water at certain times only, whereby a flooding and damage would result only occasionally, and in a time of high water. Here, the obstruction is such, and so applies to the use by plaintiffs of their property, that there is a continued obstruction and loss of power. Here the deposit of sludge, the cause of loss of power and consequent damage, was in effect before the existence of the cause was discovered by plaintiffs. The abatement of the cause of the damage could not be had as the result of the order or process of any court. It is not a case wherein the party can secure the cessation or abatement of the acts causing an injury, and the abatement of such acts discontinues the infliction of injury. On the contrary, it is a case wherein a certain physical condition had been created upon plaintiffs' property by the acts of defendant—a condition which in ordinary course

will continue with more or less effect, unless removed by human labor. The party injured has no means to compel the party creating the condition to remove it. If that is to be done, the injured party can only cause it to be done by the expenditure of his own means, and at his own risk, as to whether the result will justify such expenditure.

Essentially, the question here is whether under the facts the plaintiffs can treat the injury as complete and permanent, and recover for the destruction or loss of the beneficial use of the mill property, in one action, or, can only recover damages as for a temporary loss or injury, incurred before the bringing of the suit, and be thereafter relegated to successive actions for damages. Counsel in their brief say that in determining whether the injury to real property is permanent the rule is to "ascertain the character of the cause of the injury, and that if the structure or agency causing the injury is susceptible of alteration or abatement, then in law the injury is temporary." But, some of the cases cited, in their mode of determining the question, go beyond the limits of the rule as stated by counsel. Under the contention made they have cited a number of cases: Robinson v. Mining Co., 178 Mo. App. 531; Thompson v. Paving Co., 199 Mo. App. 356; Bartlett v. Grasselli Chem. Co. (W. Va.), 115 S. E. 451, 27 A. L. R. 54; Hanlin v. Meat Co., 174 Mo. App. 462; Kelly v. City of Cape Girardeau (Mo. App.), 284 S. W. 521; Ivie v. McMunigal, 66 Mo. App. 437; Schoen v. Kansas City, 65 Mo. App. 134; Pinney v. Berry, 61 Mo. 359; Brown v. Chicago & Alton Railroad Co., 80 Mo. 457; Howard County v. Railway, 130 Mo. 652, 32 S. W. 651. We refer further to some of these.

In Robinson v. Mining Co. the defendant for two years dumped the refuse or tailings from its mine upon plaintiffs' land. Plaintiffs' land was itself mining land, and he alleged that it had great value for mining purposes, but that its value had been destroyed for such use, and could not be so used until the tailings were removed. The defendant, in its answer averred that the tailings had been abandoned by it, and that the tailings had a value of $500. Both parties introduced evidence as to the market value of the land before and after the deposit of the tailings, and also evidence as to the cost of removing the tailings. The court upon appeal sustained the findings of the trial court as to the amount of damages found, and said that the usual measure of damages in such cases is the difference between the value of the land with and without the tailings thereon, but that where the cost of removal is less than such difference, the cost of removal is the measure of damages. The case was one where the defendant introduced the defense of mitigation of the damages, showing the value of the

tailings and cost of removal of them. In the case at bar, the defendant did not set up the defense of the feasibility of removal or cost of removal of the sludge, but the answer was a general denial, followed by a denial that the dam was built and maintained by legal authority, and the plea that plaintiffs and their predecessors did not clean their pond from time to time as became necessary, but allowed the accumulation of mud and debris therein, which could have been reasonably prevented, and the further plea that if sludge accumulated in the pond it came from other mines operated in the vicinity and drainage area.

The case of Thompson v. Paving Co., supra, was a suit by a landlord, out of possession, to recover compensation against the defendant who had used plaintiff's property as a place for dumping earth. In the opinion the court referred to the rule as to measure of damages stated in the Robinson case—the amount of depreciation in market value—unless the cost of removing the dirt was less than the depreciation, but recovery was denied the plaintiff in that case on grounds not related to the question whether the injury was permanent.

Counsel call especial attention to the case of Bartlett v. Grasselli Chemical Co., supra, the West Virginia case. In that case the defendant operated a large plant in the reduction of zinc ores, and the plaintiff complained of injury to the agricultural, residential and market value of his farm by reason of deposits upon his land from fumes, gases and dust carried from defendant's furnaces by air currents. It was claimed that these fumes or gases settled upon the vegetation eaten by live stock, and made the same deleterious, and that certain of the fumes settling upon the land impaired its fertility. The case was tried upon the theory of permanent damages, but the appellate court held the injury was not permanent. The opinion contains an extensive discussion of the conditions or elements to be considered in determining when recovery of permanent damages can be had. The discussion is largely from two angles: First, the character of the injury itself, and second, the character of the cause of the injury. Speaking of the character of the injury itself, the court said: "Though continuous, it may be slight and readily compensable in damages, as well as remediable by the injured party. Though of considerable magnitude, it may not be continuous. There may be a continuing cause without a continuous injury. The latter may be intermittent and recurrent. It may involve a trespass, or there may be injury without an actual trespass." Further on, speaking of the character of the cause of the injury, the court said: "If it is temporary, the damages are not original and permanent. If the structure or other agency causing the injury is susceptible of alteration, at slight expense and trouble, so as to terminate the injury, it may be as-

sumed that the persons causing it will make the alteration, rather than suffer repeated actions for damages.'' Announcing its conclusions upon the facts in that case the court said: ''The injury in respect of which this action is brought is consequential and flows from a purely private nuisance. There has been no trespass upon the plaintiff's lands. The furnaces and business working the injury are located and conducted upon the defendant's own land. It is clearly within its power to abate these nuisances, by an alteration of its furnaces or methods of operation, or by cessation of the operations working the injury, and it is likewise abatable by judicial process. Hence it lacks the elements of permanency, essential to right of recovery of permanent damages measured by depreciation in the value of the land.'' The case seems to be clearly distinguishable from the case at bar, in several respects. Here the cause of the injury is a deposit upon the bottom of plaintiffs' pond, and the deposit acts as a continuous cause, which is not slight, but according to plaintiffs' evidence destroys the power. The injury is not merely intermittent and recurrent, but constant and continuous. The deposit, the agency causing the injury, though susceptible of alteration, cannot be altered at slight expense and trouble so as to terminate the injury, nor can it be abated by judicial process. It is not a structure upon defendant's land or a process of operation going on upon defendant's land, but a deposit upon plaintiffs' land, which plaintiffs cannot by judicial process compel defendant to remove.

In Hanlin v. Meat Co., supra, the defendant, operating a meat-packing plant, emptied into a stream running over plaintiff's land offensive substances and fluids, which polluted the stream, and destroyed a well adjacent thereto. It was held that pollution of the stream could be abated by the defendant, and was of a temporary nature, but also held that the injury to the well was permanent because it had been destroyed.

In Kelly v. City of Cape Girardeau, supra, the plaintiff's complaint was the overflow of his property by surface water from a sewer. He was permitted to bring successive actions. The ground upon which the injury was held temporary was, that the cause of it was not permanent in a legal sense, but could be abated by the city, by the enlargement of drainage pipes or diversion of the water.

Ivie v. McMunigal was a case where the complaint was of damage from smoke, cinders and dirt falling upon plaintiff's dwelling house from defendant's foundry. Permanent damages were held to be not recoverable on the ground that it was a nuisance such as could be removed the day after verdict, or could be abated by the order of a competent court, or, if continued, a second or third action for damages was maintainable.

In Schoen v. Kansas City, the injury complained of, pollution of the water of a stream by emptying a sewer therein, was the result of a temporary delay in the construction of a sewer. The ruling proceeded upon the theory that the cessation of the work was not permanent, and that when the work should be continued the nuisance would cease.

In Pinney v. Berry, the plaintiff complained of the erection and maintenance of a dam across a creek which caused the water to flow up a branch on plaintiff's land, cutting off communication with a part of his land, filling the branch with mud, leaves, etc., and creating a nuisance which injured the health of his family. The plaintiff was permitted to prove that his property was rendered less valuable per acre and that a spring was destroyed, and the value of the spring. The petition contained no allegation as to the destruction of a spring, and objection to the evidence was made upon that ground. No instructions were asked or given by either party. It was ruled that the trial court erred in allowing the plaintiff to prove the value of his land before and after the creation of the nuisance. After stating what was said to be the rule of damages for negligent injury to real property the court said: "But it is obvious that this rule has no application to such nuisances as may be removed the day after the verdict, or for the continuance of which a second or third action may be maintained, or which may be abated at the instance of the injured party by the order of a competent court." Considering the state of the pleadings and facts in that case we are unable to give to the ruling controlling force in the instant case.

In another of the cases cited for defendant, Howard County v. Railway, 130 Mo. 652, the defendant placed large quantities of rock in the bed of a creek at a place near and above where a bridge was maintained by the county. The rock turned the current of the stream against the piers of the bridge, undermining them, and the county was compelled to spend considerable money in repairing the injury. The injury developed gradually, but was inevitable, the current being changed. There, the acts of defendant were held to have created a permanent nuisance, and it was held that the injury, though taking time in its manifestation and effect, was in fact direct, immediate and complete, and the damages could be measured immediately in one action. In the case at bar, by the acts of the defendant and when the deposit reached an amount sufficient to destroy the power, there was produced a condition which from its nature would continue, unless changed by human labor, and produce loss independently of any subsequent wrongful act of defendant.

In Town of Troy v. Cheshire Railroad Company, 23 N. H. 83, the court in the discussion of the question of when damages are

original, and recovery may be had in one action, said, at page 102: "Wherever the nuisance is of such a character that its continuance is necessarily an injury, and where it is of a permanent character, that will continue without change from any cause but human labor, there, the damage is an original damage, and may be at once fully compensated, since the injured person has no means to compel the individual doing the wrong, to apply the labor necessary to remove the cause of injury, and can only cause it to be done, if at all, by the expenditure of his own means." The doctrine there announced has been followed by some courts, and rejected by others. The rule there stated was criticized by the Supreme Court of Tennessee, in Nashville v. Comar, 88 Tenn. 415. That court referring to the utterance of the New Hampshire court said: "There are supposable nuisances, which, by the effect of time, might at last abate themselves, but by far the greater number of trespasses, wrongs and nuisances would continue indefinitely without the expenditure of human labor to remove or abate them. It is a rule which does not commend itself by either its reasonableness, its certainty of application, or its justice." The rule is cited with approval by the Supreme Court of Iowa in several cases. [Powers v. Council Bluffs, 45 Iowa, 652; Harvey v. Mason City & Ft. Dodge Ry. Co., 129 Iowa, 465, 472.]

In James v. City of Kansas, 83 Mo. 567, the plaintiff complained that the city, without leave and wrongfully, entered upon his lots and built a sewer thereon, whereby the cost of construction of the foundation of his house was made greater than it otherwise would have been, to his damage. In that case there was a taking of the plaintiff's property for a public use without compensation, but the case was not discussed nor disposed of upon that theory ,and the plaintiff was denied a recovery, upon the ground that he was barred by limitation, but in so holding this court said, at page 570: "The wrongful entry and building the sewer across plaintiff's lots was the whole cause of the damage, complete and entire at that time, and for which full compensation could have been readily estimated for the whole wrong. [Soulard v. St. Louis, 36 Mo. 546; Wood on Lim., p. 371, sec. 180; Powers v. Council Bluffs, 45 Iowa, 652; Troy v. Cheshire Ry. Co., 3 Foster (N. H.) 83.] In 45 Iowa, supra, the court say: 'Whenever the nuisance is of such a character that its continuance is necessarily an injury, and when it is of a permanent character that will continue without change from any cause but human labor there the damage is an original damage and may be at once fully compensated.' "

In Martin v. Chicago, S. F. & C. Ry. Co., 47 Mo. App. 458, reference was made to an embankment "which would continue without change from any cause but human labor." It was an embankment constructed in an avenue in front of the plaintiff's

lot, and so near to the plaintiff's lot that the avenue was so obstructed that it could not be used by the plaintiffs for the uses of his lot and its improvements. In holding the damages were original the court referred to the Iowa and New Hampshire cases.

The question of the character of nuisances as continuing, and of when the cause of action arises, and whether successive actions must be brought is discussed at great length in the annotation to be found in L. R. A. 1916E, beginning at page 997, and there, as elsewhere in the authorities, there is mentioned the difficulty to be found sometimes in applying in a given case such general rules as have been formulated.

Seeley v. Alden, 61 Pa. 302, was a case in some of its aspects similar to the case at bar. In that case the plaintiff was the owner of a mill-dam and mill operated by water power. The complaint was that the proprietor of a tannery upstream threw tan bark into the stream, whereby plaintiff's dam was obstructed and the power lost. In that case the court said at page 305: "The court below erred, therefore, in confining the proof of damages of the plaintiffs to the mere use of the water. Being the owners of the property, as well as in its actual possession and use, they had a right to all the damages flowing directly from the tort of the defendant. If, therefore, a permanent injury was created by the lodgment of the tan bark in the pool of their dam, which actually depreciated the property in value as a water-power, it must affect the price or value of the land to which it belonged; and why should this not be compensated in damages? It is difficult to give a good reason against it." It was held that the question whether there was permanent damage was a question for the jury, and also the question of the extent of the damages. The trial court instructed the jury that if there was an annual amount of damage done during the years of the obstruction they might estimate it in that way, and rejected the evidence offered by the plaintiff as to the value of the property before and after the deposit causing the obstruction, or the difference in market value; and also rejected evidence offered by plaintiff as to how much it would cost to remove the tan bark from the pool. The court on appeal held that the trial court erred in refusing to submit both methods of computing the permanent damages—that which measured the damages by the different values of the land with and without the deposit, and that which measured them by the cost of removing the deposit. It was held that if the cost of removal of the deposit in a given case would be less than the difference in value, the cost of removal would be the proper measure, but if the cost of removal was shown to be greater than the difference in value shown, then the difference in value merely would be the true measure of dam-

ages. The court had in mind the fact, or the question of the removable character of the deposit by human labor, nevertheless, held the question of permanence was for the jury, but held that the measure of damages might be either the difference in value or the cost of removal, dependent upon what might be found from the evidence.

In Hayes v. Railroad, 177 Mo. App. 202, there is extensive discussion, and citation of many authorities, upon the question of damages to property, and whether recovery may be sought in one action, or the injured party must resort to successive actions. In that case the Springfield Court of Appeals, at page 218, said: "The general rule is that, whenever the nuisance or improvement is permanent in its character, or when the injury flowing therefrom is permanent, regardless as to whether the nuisance remains or is abated, the entire damage may be assessed in one action." Further on the court said, at page 219: "There can be no doubt that where the cause or source of the injury is *permanent* and *non-abatable* and the resulting damages go to the total or partial destruction of the land or continuously prevent its beneficial use in whole or in part, as by washing away the soil, covering the same with rock, constant flooding of land or mines, continuous discharge of sewage, noxious gases, etc., then the cause of action accrues once for all and must be sued for in one action within the statutory period of limitation. The authorities are practically unanimous to this extent."

Many other cases are cited in the brief for respondent from this and other jurisdictions. Among the cases cited from other jurisdictions is Risher v. Acken Coal Co., 124 N. W. (Ia.), 764. In that case the defendant deposited a great dump of waste material on the plaintiff's land, the dimensions of which were given. It was held to be permanent, and could be so treated by the plaintiff; that the plaintiff could elect whether he would treat the injury as permanent or continuing, and that the defendant could not complain of such election.

In Adam v. Railroad, 139 Mo. App. 204, the Kansas City Court of Appeals said, at page 207: "Where the destruction of the thing includes but a temporary injury to the land, and the thing can be replaced in a comparatively brief period, the true measure of damages is the cost of replacing it and the rental value of the land until it is replaced; but where the destruction of the thing inflicts more than temporary injury to the land, or the replacement would be impossible or tedious or uncertain, both in cost and result, the criterion is the damage inflicted upon the market value of the land."

In the case at bar, we hold that the question of whether there was a permanent injury to plaintiff's property was one for the jury.

The defendant asked no instruction basing the amount of damages, if any upon the expenditure required to remove the deposit, and could not ask such an instruction, since there was no evidence to show just what the probable expenditure would be; although the evidence does show that the removal would be a task of some magnitude in time and expenditure. The testimony for plaintiffs as to the amount of the sludge, in a general way tended to show a large amount. The testimony for defendant tended to show a much less quantity.

The plaintiffs' Instruction A which authorized a recovery for plaintiffs, taken with plaintiffs' Instruction B, authorized such recovery in the amount of the difference in market value, if the jury found that, by the deposit of sludge caused by defendant, the character of the stream in the mill pond was permanently changed, and the sludge interfered with the equipment and machinery of the mill to the extent that it lowered, decreased or rendered inefficient the operation of the mill by water and thereby the plaintiffs' property was permanently reduced in value. The court refused defendant's Instruction 7, whereby defendant asked the court to instruct the jury that the burden was upon the plaintiffs to show, by a preponderance of the evidence, that the defendant, by wrongfully discharging sludge into the pond, had permanently destroyed or impaired the value of the mill property; and also, that the burden was upon plaintiffs to show that such condition could not be remedied at a reasonable expenditure and within a reasonable time, and that if the evidence did not establish such facts then the finding must be that plaintiffs' property was not permanently destroyed or impaired. It would be neither good sense nor justice to permit the jury to find that the deposit of sludge permanently changed the condition and made the power inefficient for the operation of the mill, and fix the damages at the difference in value before and after the change, without any requirement of finding that the condition could not be remedied at a reasonable expenditure. If the sludge could be removed and the normal condition of the pond restored for an expenditure much less than the alleged difference in market value, then that cost should be taken as the measure of damages done to the property.

The plaintiff, Earl Blankenship, placed the value of the property, the twenty-four acres of land and its improvements, before the deposit of the sludge, at $10,000, and the value after the deposit at $2,000, or a difference of $8,000. No instruction on punitive damages was given. The jury returned a verdict for $10,000 without being required to find that the obstruction could not be removed for reasonable expenditure—at an expense justifying its removal

—and without being required to consider that question at all. What constitutes permanence in a structure or cause of damage is perhaps not easy of exact definition, but under the evidence in this case, we think the obstruction here may be regarded as permanent —one not abatable by process of a court—and one likely to continue unless and until changed by human labor and cause a loss of power not recurrent, but continuous in character. On that ground we hold that plaintiffs were not confined to a recovery for only such damages as accrued up to the time of the bringing of the suit. On that ground also, we hold that plaintiffs could treat the injury as permanent and as a basis for recovery of all damages resultant to their property as mill property. But, the measure of damages was not necessarily confined to the difference in value before and after the existence of the obstruction as shown by plaintiffs. If plaintiffs had introduced evidence tending to show that the cost of removal would be equal to or greater than the difference in value before and after the deposit of sludge then the burden would have been on defendant to come forward with evidence tending to show that the cost of removal would be less than the difference in value before and after the deposit.

The plaintiffs' witness Hershey said the removal of the sludge was something he (if owner of the property) would only undertake to do if he "had plenty of money." The cause of the loss of power being actually removable by human labor, the plaintiffs were not entitled to go to the jury for the recovery of permanent damages to their property, in an amount based solely upon the evidence as to its value before and after the deposit of the sludge, without any evidence to show that the cost of removal would be equal to or approximately equal to the difference in value. We think the burden of making that showing was upon the plaintiffs as a part of their case. They had that burden in electing to treat an injury as permanent which they were at liberty to remove. In this respect the plaintiffs stopped short of making their case as it was submitted under their Instructions A and B authorizing a recovery of damages, in an amount based solely on the difference in the market values of their property before and after the deposit of the sludge.

Plaintiff, Earl Blankenship, was permitted to testify as to the amount of profits made from the operation of the mill during the two years he operated it. This was not submitted as an element of damage for plaintiffs, but the court gave defendant's Instruction 17 which told the jury they could not allow any sum whatever to compensate plaintiffs for loss of trade, business or profits—past, present or future. This was proper enough as against the theory of plaintiffs' instructions allowing permanent damages in the sum of the difference in the market value of the property; but, taking the obstruction as one which plaintiffs could

treat as permanent in character, except through removal by human labor, the loss of profits or the use of the property was an element of damages, provided the cost of removal be less than the difference in market value.

There are several other assignments of error, but all the questions raised will not be discussed here, at least at length, since the cause must be remanded under the conclusions heretofore announced. Defendant complains of the refusal of its offered Instruction No. 9, which would have told the jury that it was the duty of plaintiffs when they learned the sludge was being deposited in the pond, to exercise reasonable diligence to prevent or reduce the amount of injury, and that defendant could not be held liable for any injury subsequently resulting which might have been so avoided or reduced by the plaintiffs. This point is urged in view of the testimony of the witness Hershey, heretofore mentioned, who thought if plaintiffs had cut the dam at the time the sludge was discovered most of it would have run out in a year. The causing of the sludge to be cast into plaintiffs' pond was a wrongful act, and a trespass, resulting in a private nuisance, but neglect of the plaintiffs to cut the dam and allow the water to run out for a year, if that would have resulted in running out most of the sludge, cannot be taken as an excuse from liability on the part of defendant for its wrongful act. [Paddock v. Somes, 102 Mo. 226; Grant v. St. Louis, I. M. & S. Ry., 149 Mo. App. 306.]

Defendant complained of the refusal of its Instructions 4 and 8, concerning the responsibility of defendant for the breaking of the so-called upper dam, the embankment constructed along the bank of the creek to prevent the changing of the channel at that point.

Number 4 was in the nature of a demurrer to the evidence as failing to show any liability on the part of defendant for any loss due to the breaking of the upper dam, or the passing of the water through an opening at the upper dam.

Number 8, would have told the jury that even though their verdict should be in favor of plaintiffs, they could not allow any sum by reason of the water breaking through the upper dam, and the diversion or loss of water thereby. The court, however, did give defendant's Instruction 16, which told the jury the burden was upon plaintiffs to prove, by the greater weight of the evidence, that the breaking of the water through the bank at the so-called upper dam resulted from the wrongful act of the defendant, and that if they found the greater weight of the evidence did not show said breaking would not have occurred but for the acts of defendant, then they must exclude such breaking from their consideration in determining any liability of defendant therefor, and

allow plaintiffs nothing for any loss resulting from any such breaking and consequent loss of water supply.

Complaint is also made of the refusal of defendant's Instruction 11. This instruction is as follows:

"The court instructs the jury that it is a matter of physical law which cannot be disputed so long as the bed of the mill pond and the entrance thereto above the mill dam was not above the elevation of the dam itself, the filling of the bed of the mill pond and of the entrance thereto at any point lower than the mill dam would not have the effect, of itself, of causing the water to break through at or near the so-called upper dam."

We hold there was no error in refusing Instruction 11. The sludge was cast into the stream at a point not far below the so-called upper dam and not far above the head of the mill pond. We are not prepared to say as a matter of undisputed physical law that the sludge forming an obstruction at a short distance below the so-called upper dam, would not at the time of very high water, as in October, 1926, cause a greater pressure of water against the so-called upper dam. On that ground and because of the giving of Instruction 16, we hold the refusal of Instructions 4, 8 and 11 cannot be regarded as reversible error.

During the taking of the testimony for plaintiffs, the defendant amended its amended answer by alleging there was a defect of parties plaintiff in that one John Bartlett had a mortgage or deed of trust upon the property to secure an indebtedness of $2,000, and said Bartlett was not joined herein. The plaintiffs objected to such amendment and moved that it be stricken out; and at the close of the evidence the court struck out the amendment.

Counsel for defendant say if this was a suit for permanent injury all parties interested in the land should have been made parties to the action, so that defendant could not be subjected to repeated suits for the same injury. The defendant did not move to have the mortgagee and his trustee made parties to the suit, but seems to stand here upon the proposition that plaintiffs had no right to sue for the damages without making the mortgagee a party. We do not think the plaintiffs as owners of the land were so united in interest with the beneficiary and trustee under the mortgage or deed of trust, as to require that they be made parties. [Craig v. Carmichael, 271 Mo. 516, 522.] But, at any rate, there is nothing to prevent the joinder of the mortgagee as a party upon the retrial of the cause, if it be tried again.

There is another fact to be considered: After the washout of the upper dam the plaintiffs repaired it so as to hold the flow of water in the channel at that point, but that did not restore the

power so as to run the wheat mill, and the corn mill could be run thereafter only occasionally. There are other matters discussed in the brief of defendant, but since the cause is to be remanded we will not assume that the same questions will arise in the same way upon another trial.

The judgment is reversed and the cause remanded. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.