242 S.W.2d 599 (1951)
DIMICK et al.
v.
J. K. NOONAN et al.
No. 21516.
Kansas City Court of Appeals, Missouri.
October 1, 1951.
Paul R. Stinson, Dick H. Woods, Kansas City, for appellants.
John W. Coots, Jr., Platte City, E. E. Thompson, Sam Mandell, Kansas City, for respondents.
BROADDUS, Presiding Judge.
This is an appeal by defendants, J. K. Noonan, Wilbur J. Dean and Contractors Sales and Equipment Dealers, a corporation, from a judgment awarding plaintiffs $3,550 damages.
*600 Plaintiffs Edwin T. Dimick and Emma E. Dimick, husband and wife, instituted this action in the Circuit Court of Clay County on July 26, 1947. The action was based on a contract for grading a tract of land owned by plaintiff Emma E. Dimick. Subsequently the case was sent to the Circuit Court of Platte County on plaintiffs' application for a change of venue.
The case was tried on plaintiffs' second amended petition which consisted of two counts, the first alleging, in substance, that plaintiffs were the owners of land along the east side of U. S. Highway No. 169 in Clay County, Missouri; that on February 27, 1947, plaintiffs and defendants entered into a contract whereby defendants agreed to grade the tract of land, without cost to plaintiffs and to pay plaintiffs the reasonable value of the dirt removed. Plaintiffs then alleged that defendants had removed approximately 85,000 cubic yards of dirt in the grading operation, for 72,000 yards of which plaintiffs were entitled to 10¢ per cubic yard; that for the remaining 13,000 cubic yards plaintiffs were entitled to compensation at the rate of $1.50 per yard, such sum being the reasonable cost of bringing the property to the grades specified in the contract. Plaintiffs also prayed for $5,000 damages for defendants' delay in grading the south portion of the land.
By Count 11 plaintiffs sought to recover $7,200 from defendant Wilbur J. Dean on the theory that he had converted to his own use 72,000 cubic yards of the dirt removed in the grading operation.
Defendants' joint and several answer to Count 1 admitted the making of the contract but denied that its terms obliged Contractors Sales and Equipment Dealers or them to pay anything for the dirt removed. Defendant Wilbur J. Dean filed a general denial to Count 11. At the close of their case, plaintiffs dismissed Count 11.
The case was submitted to the jury on three main issues, namely: (1) Whether the contract obligated defendants to pay plaintiffs the reasonable market value of the dirt removed in the grading operation; (2) Whether defendants failed to bring to contract grade certain low areas; and (3) Whether defendants had removed dirt in excess of and below the specified contract elevations. The jury returned separate verdicts against all defendants on the three issues submitted. On the 1st, $3,000; the 2nd, $500, and the 3rd, $50.
In February of 1947 and for several years prior thereto plaintiffs owned a tract of land approximately 600 feet square located on the east side of U. S. Highway 169 just north of North Kansas City, Missouri. The highway at that point runs up hill from south to north. The west line of plaintiffs' property was 30 feet east of the east edge of the 4-lane slab. At the northwest corner the land rose, within 50 feet of its west line, at an angle of 45 degrees to a height of 45 to 50 feet above the highway and then sloped to the east to a creek bottom which was about 300 feet east of the west line. The land sloped to the south, and south of the south boundary line of their property there was a deep draw which started at the southwest corner and ran along their south line. The soil was free of rocks. It was "loess soil * * * a clay, sandy soil, that is very susceptible to compaction; that is, it is possible to get a good impervious coat of it." The proximity of the Dimick tract to fills being built on levees in North Kansas City and at the Kansas City, Missouri airport, made the soil desirable.
In January of 1947, defendant Wilbur J. Dean called on Mr. Dimick to ask if he was "interested in selling that dirt." Mr. Dimick said he was and also wanted the property brought to certain grades. He went to Mr. Dean's office. Defendant J. K. Noonan was present. They had several conferences, after which Mr. Dimick undertook to assemble the data needed in preparing a contract. Mr. Dimick had a law clerk, who was living in his home draft a contract and took it to the offices of Mr. Noonan and Mr. Dean, objections arose, and Mr. Noonan had another contract drawn which Mr. and Mrs. Dimick signed.
In its first paragraph, the contract recites the Dimicks' (parties of the first part) ownership of the land involved. The second paragraph says that the Contractors *601 Sales and Equipment Dealers (parties of the second part) are the owners and operators of dirt moving and grading machinery and equipment and have use for and are desirous of obtaining large quantities of clay dirt. The third paragraph recites that the Dimicks, by virtue of their ownership of the land, own a large quantity of clay dirt lying in the 400 feet area south of the north line of the described property. The fourth paragraph is: "Now Therefore, the parties of the first part agree to sell to the party of the second part clay dirt to be taken and hauled away from the above described property under and in accordance with the specifications hereinafter set forth, second party agrees to bring to the grades herein specified the property set forth in the specifications detailed herein and hereby made a part of this contract."
The contract then refers to a "Contour Map of Area" prepared by Mr. Dimick and attached to the contract in which the area affected by the contract has been marked off in 50 feet squares and the elevations of the approximate finished grades are shown. The contract also provides for the filling of two small areas along the east boundary where the elevation is below that of the specified finished grades.
The contract further provides that the finished grade of the property from north to south shall lower at a uniform and gradual rate of approximately 6% extending along the whole affected portion and that the finished grade from the west boundary to its east boundary line shall lower at a uniform and gradual rate of approximately 4%.
Grading operations were commenced on July 5, 1947, and continued at intermittent intervals until the grading was completed in April, 1948. Not long after the signing of the contract, disputes arose between the parties concerning the commencement of grading operations, the manner in which the grading was being done and the meaning of above paragraph 4 of the contract.
Mr. Dimick testified that on June 27, 1947, he told Mr. Dean that plaintiffs expected to be paid for the dirt; that Dean asked if Mr. Dimick could estimate the amount of dirt to be removed in order to bring the Dimick tract down to grade, and said: "Figure it and send me a statement." Mr. Dimick sent him a statement on the next day, but discovered an error in it and, on July 3, 1947, sent a corrected statement, claiming 10¢ per yard for 70,724 yards, a total of $7,072.40.
On the theory that the language of the 4th paragraph of the contract was ambiguous the trial court permitted Mr. Dimick to testify that the price he was to be paid for the dirt came up in conversations before the final contract was typed and that defendants Noonan and Dean said the price would be the reasonable market value as determined at the time the dirt was removed; that he discussed the peculiar phraseology of the 4th clause with Noonan before the contract was signed and asked, "How will we arrive at the price on that dirt with wording like that?" and that Noonan answered, "Dimick, we have discussed that, and the proposition is that we will pay you the reasonable market price for that dirt when it is removed."
These conversations were denied by Noonan who testified that in those conversations he told Mr. Dimick that defendants would not pay anything for the dirt, and that Mr. Dimick "said that was alright. After he signed the contract he said, `I gave the other end of my property to George Shaw for nothing, so we might as well have yougive this to you for nothing." The transcript shows that Shaw, a contractor, had partially graded a portion of the tract in 1946.
F. M. Hands, a civil engineer, testified on behalf of plaintiffs that he had determined by mathematical calculations that defendants had removed a total of 79,281 yards of earth. From surveys made by Mr. Hands, Mr. Dimick prepared a computation which showed the total yardage removed below the specified grades to be 6,583.
Some of the dirt was sold to two contractors and hauled away by them. The rest of the dirt was moved by defendants to a piece of property on the south which Mr. Dean has purchased.
*602 Defendants' witness, A. W. Zimmer, testified that the value of plaintiffs' property was enhanced by being brought to the highway grade, because as it stood in 1947 it could not be used for ordinary purposes.
Defendants' main contention is that the contract is unambiguous and the lower court erred in admitting parol evidence to vary its terms. In other words, they assert that Mr. Dimick should not have been permitted to testify that, in conversations with defendants Noonan and Dean before the contract was signed, he was told by them that plaintiffs would be paid the reasonable value of the dirt when it was removed. The contract's 4th paragraph, set out above in italics, provides: "The parties of the first part agree to sell to the parties of the second part clay dirt, etc." It is to be noted that it is silent as to the price to be paid. The ordinary meaning of the word "sell" as stated in Webster's New International Dictionary, 2nd Ed., Unabridged, is: "To sell is to transfer to another for a price, usually to be paid in money."
In Stout v. Caruthersville Hardware Co., 131 Mo.App. 520, 110 S.W. 619, 620, it is said: " * * * An essential element of a sale is a money price, either fixed by an agreement between the buyer and seller, or capable of being ascertained from their agreement."
Defendants say the language of the paragraph means that plaintiffs were selling the clay dirt to be removed in the grading operations to defendants in return for defendants grading the property. But this intention does not clearly appear. The applicable rule of law is well stated in Huddleston v. Huddleston, Mo.App., 11 S.W.2d 1065, 1066: "Unless the contract on its face is ambiguous, then it was error to admit parol evidence to show the extent and amount of timber sold. McPherson v. Kissee, 239 Mo. 664, 144 S.W. 410. A contract is ambiguous when its terms are reasonably susceptible of different constructions. Webb-Kunze Const. Co. v. Gilsonite Const. Co., 281 Mo. 629, 220 S.W. 857." And in Avellone v. John Weisert Tobacco Co., Mo.App., 213 S.W.2d 222, 230, it is said: "In determining the meaning of a contract, especially where there is a want of clearness in the language used, it is always permissible for the court to consider the situation of the parties and the accompanying circumstances at the time of the execution of the contract. 17 C.J.S., Contracts, § 321; Restatement of the Law of Contracts, Sec. 235; St. Louis Union Trust Co. v. MacGovern & Co., 297 Mo. 527, 249 S.W. 68; North St. Louis Building & Loan Ass'n v. Obert, 169 Mo. 507, 69 S.W. 1044; Velvet Freeze, Inc., v. Milk Wagon Drivers, etc., Mo.App., 177 S.W. 2d 644."
We think the language contained in the clause under consideration is ambiguous and that the trial court did not err in admitting the testimony complained of.
Defendants next contend that plaintiffs' Instruction 4 was erroneous because it submitted conflicting and incompatible rules for measuring plaintiffs' damages.
This instruction, after requiring a finding that defendants failed to bring the areas along the east boundary line of plaintiffs' property to the approximate finished grades provided for in the contract and that plaintiffs were damaged thereby, contains these words: "Then you are instructed your verdict, upon this issue, shall be in favor of plaintiffs and you assess their damages, if any, upon this issue, at the reasonable cost of placing a sufficient quantity of suitable dirt upon said areas to bring same to such specified finished grades provided in said contract, or you may assess plaintiffs' damages, if any, upon this issue in such amount, if any, as you find from the evidence the value of said property, as a whole, was decreased, as a direct result of the failure of defendants to so fill aforesaid areas and bring same to the approximate specified finished grades described in the contract in question, whichever amount is the lesser."
Defendants say that the only "proper measure of damages was the difference between the fair market value of the land at the produced final elevations and the *603 fair market value of the land at the contract specified elevations."
In Vol. 25 C.J.S., Damages, § 84, pages 603-605, it is said: "The measure of damages for injury to real property is not invariable, the amount to be awarded being such sum as will compensate the injured owner for the detriment proximately caused thereby. Ordinarily, the difference between the fair value of the property immediately before and immediately after the injury will be taken as the measure, at least where the injury is permanent, or where the damage cannot be well expressed in specific items of injury, although it affects in a substantial degree the value of the entire property as a unit. * * *
"Where the injury to real property is merely temporary, or where the property can be restored to its original condition, the measure of damages may be, or should include, the cost of restoration, as where the injury is susceptible of remedy at a moderate expense and the cost of restoration may be shown with reasonable certainty, or where the cost of restoration is less than the diminution in the value of the property."
Among the many cases cited in support of the above is that of Thompson v. Granite Bituminous Paving Co., 199 Mo.App. 356, 203 S.W. 496, 498, where it is said: "In an action of this character the measure of plaintiff's damages would be the depreciation in the market value of the land if any, resulting from the dumping of the earth thereupon * * * (citing cases), unless it appear that the cost of removing the soil thus placed upon the land would be less than such depreciation in the value of the freehold (Robinson v. [Moark-Nemo Consol.] Mining Co., supra, [178 Mo.App. 531, 163 S.W. 885], and cases cited)."
The case of Blankenship v. Kansas Explorations, 325 Mo. 998, 30 S.W.2d 471, 479, is an instructive one on this question. It was an action for damages alleged to have been caused by the mining operations of defendant, in dumping sludge and debris into the mill pond of plaintiffs whereby, it was charged, the pond was so far filled as to destroy the water power by which plaintiffs had operated a grist mill. After reviewing many authorities, the opinion held that "the measure of damages was not necessarily confined to the difference in value before and after the existence of the obstruction as shown by plaintiffs. * * * If the sludge could be removed and the normal condition of the pond restored for an expenditure much less than the alleged difference in market value, then that cost should be taken as the measure of damages done to the property."
Defendants contracted to bring plaintiffs' land to certain specified levels and to fill in the depressions existing on the east boundary in order to bring them up to grade. They failed to do so, according to plaintiffs' evidence. Proof of the cost of bringing the property to grade and of filling in the depressions was certain and definite. Under the above authorities plaintiffs were entitled to either the reasonable cost of bringing the property to grade and of filling in the depressions, or to the difference between the fair market value of the land at the produced final elevations and the fair market value of the land at the contract specified elevations, whichever was lower.
Defendants could not have been prejudiced by the giving of this instruction. There is no claim that the verdict was excessive or not supported by the evidence. We rule the point against defendants.
Defendants also assert that Instruction No. 5 given on behalf of plaintiffs ignores their own evidence that the contour map elevations were controlling, and is therefore erroneous. This instruction dealt with the question of whether defendants removed dirt in excess of that required to bring the property to the approximate finished grades. The jury returned a verdict of $50 against defendants under this instruction.
Although the eighth and ninth paragraphs of plaintiffs' Exhibit I (the contract) specified a finished grade for the entire property from north to south of approximately 6% and from west to east of approximately 4%, the contour map attached to and made a part of that contract, *604 called for different grades. For example, the contour map grade for the south line of the property is about 1.9% east to west. The grade continues to be an east to west grade from the southern boundary line until the line 267.3 feet north of the southern boundary is reached, where it first changes to a west to east grade. The contour map grade for the west boundary line is about 2.8% from north to south, gradually increasing to 5.64% at the east boundary line.
Mr. Dimick testified that the grades he demanded were those shown on the contour map and that it controlled. This instruction was based on the uniform 6% and 4% grades described in the typewritten portion of the contract and thus completely ignored plaintiffs' own testimony that the grades demanded and which controlled were those specified on the contour map. For this reason, it is erroneous.
Defendants attack plaintiffs' Instruction No. I on the ground that the transcript contains no evidence of the partnership between defendants Noonan and Dean. Plaintiffs' second amended petition, on which the case was tried, charged that "at all times mentioned herein defendants Wilbur J. Dean and J. K. Noonan were copartners * * *." The answer of defendants to that petition did not deny "by specific negative averment" the existence of the alleged partnership. Thus it was not an issue in the case. Sec. 509.150, R.S.Mo.1949; Marquis v. Pettyjohn, Mo.App., 212 S.W.2d 100, 104.
As stated, the verdict for $50 upon the third issue and awarded under Instruction No. 5 was improper. If plaintiffs will, within 10 days from the date of filing this opinion, enter a remittitur of $50, the judgment will be affirmed in the amount of $3,500, as of the date of the original judgment, otherwise the judgment will stand reversed and the cause remanded with directions to the trial court to hold the judgment in abeyance as to the first and second verdicts totaling $3,500 until the case is disposed of by retrial of the third issue, then to enter judgment for the total of the verdicts on all three issues. Sec. 512.160(3), R.S.Mo.1949.
It is so ordered. All concur.