Ann NELSON, Plaintiff/Respondent,

v.

STATE of Missouri, ex rel., MISSOURI HIGHWAY AND TRANSPORTATION COMMISSION, Defendant/Appellant.

No. 50989.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 19, 1987.

Motion for Rehearing and/or Transfer Denied June 17, 1987.

Application to Transfer Denied Sept. 15, 1987.

Jane E. King, Kirkwood, for defendant/appellant.

Claude C. Knight, St. Charles, for plaintiff/respondent.

GARY M. GAERTNER, Presiding Judge.

This is an appeal from a jury verdict in favor of Ann Nelson, respondent, which awarded her $30,000.00 in an action for inverse condemnation. Appellant, the Missouri Highway Commission (MHC), raises three issues on appeal. First, it contends that respondent failed to make a submissible case; next, it argues that the trial court erred in regard to the damage instruction; and finally, it alleges prejudicial error in the trial court's failure to admit certain evidence. We affirm.

The facts of this case are briefly recounted as follows. Respondent purchased a house in St. Charles County in 1981. Sandfort Creek abuts the property and the house sits on a bank 21 feet above the creek bed. In 1979, appellant made highway improvements by adding third lanes and median to I-70 between the Zumbehl and Cave Springs Interchanges in St. Charles County, which created 2.66 acres of impervious area within the watershed and drainage area of respondent's home. Between July, 1981 and August, 1982, MHC removed about 57,000 cubic yards of dirt from a hill-shaped area ("borrow area") located within the watershed area in order to construct the interchange at Zumbehl Road. No water retention basin was provided at that time.

Since 1981, water from the creek has risen over the bank and entered respondent's property on several occasions, the soil has eroded into the creek, and a fence and trees which were positioned in the rear portion of the property have fallen as the soil along the bank has collapsed.

The gravamen of respondent's action in inverse condemnation is that MHC's highway improvements between 1979 and 1982 caused the natural capacity of Sandfort Creek to be exceeded which, consequently, caused the damage to her property. Appellant counters that its field studies demonstrate that its highway improvements did not cause the capacity of the creek to be exceeded. It argues that any damage was the result of heavy rain conditions in the area.

Appellant's first point on appeal questions the submissibility of respondent's case. In our review of the submissibility issue, we consider the evidence in the light most favorable to respondent, give respondent the benefit of all reasonable inferences flowing therefrom, and disregard appellant's evidence which fails to support respondent's case. *Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 274 (Mo. banc 1984).

Respondent bore the burden of proving that MHC's highway improvements drained off surface waters in such a manner as to exceed the natural capacity of Sandfort Creek. We note that mere acceleration and increase of the flow of the natural drainway is insufficient to claim actionable damages. *Borgmann v. Florissant Development Co.*, 515 S.W.2d 189, 194–195 (Mo.App., E.D.1974).

Respondent's expert witness, civil engineer and land surveyor Rayford Pickett, testified that MHC's highway improvements had caused the natural capacity of Sandfort Creek to be exceeded. He stated that the erosion damage to respondent's property would continue. It was his conclusion that no other construction development upstream from respondent's property had caused or contributed to the damage because those other developments were built after the passage of regulations which required storm water retention basins.

Respondent testified that she witnessed the erosion of the land and trees in the back portion of her property beginning in 1982 and that water had come over the bank and entered her backyard in 1983. At the time she purchased the property in 1981, she was able to walk along the outside of the fenced portion of her yard. At the time of trial, this was no longer possible because that portion of the property had caved in or eroded.

■ Several of respondent's neighbors also testified. Non-expert witnesses, such as neighbors, may testify as to their opinions and experience with a situation if they are especially acquainted with a situation which is impossible to fully reproduce. *Kennedy v. Union Electric Co.*, 358 Mo. 504, 216 S.W.2d 756, 760–61 (1948). In substance, their testimony was that excessive water in the creek did not occur until after 1981 when MHC finished construction of the additional lanes and dug out the borrow area. Several witnesses testified to having seen water overflow the bank of the creek and reach respondent's backyard on numerous occasions. Further testimony was adduced to indicate that the water was fast-flowing and did not indicate any damming of the channel downstream.

MHC's expert witness, Edward Dabler, a civil engineer and land surveyor, testified that his calculations determined that MHC's project could not have exceeded the capacity of the natural drainway of Sandfort Creek. He disagreed with respondent's expert that other upstream developments had water retention facilities. Further, Dabler testified that respondent's property had been of insufficient depth and was filled at the time of development. He concluded that the present subsided area was ground fill going back to its prior condition and that this dirt crowded the natural drainway and impeded the natural flow. Dabler could not explain respondent's testimony or that of her neighbor that water had accumulated in respondent's backyard, but opined that it might have occurred as a result of an unnatural damming of the channel downstream.

MHC's other expert witness, Raymond Linebach, a geologist employed by MHC for 15 years, testified that respondent's damage resulted from a rotational landslide brought about by a combination of factors including exceedingly moist soil, improperly built fill, and an overly steep slope. In particular, Linebach testified that the soil was unable to dry out because of increased rain fall in the area which increased the weight of the soil and lessened its stability.

■ The jury was presented with conflicting theories on the cause of the damage to respondent's property. Their determination that MHC's acts resulted in the natural capacity of the drainway to be exceeded and that this caused the damage to respondent's land was not against the sufficiency of the evidence. This point is denied.

In its second point, MHC argues that the trial court erred in submitting respondent's damage instruction which was based solely on the diminution in market value of the property. Appellant claims that the court incorrectly refused its damage instruction which allowed the jury to award the cost to repair any damage.

■ When damage to real estate is permanent and the injuries are of major proportion, the proper measure of such damage is the difference between the market value of the property immediately before and after the injuries occur. *Cirese v. Spitcaufsky*, 265 S.W.2d 753, 758 (Mo.App., W.D.1954). In contrast, where the injury to real property is only slight and amenable to restoration, then the measure of damages may be the cost of restoration so long as the expense is moderate and less than the diminution in the value of the property. *Smith v. Norman*, 586 S.W.2d 84, 85 (Mo. App., E.D.1979); *Dimick v. Noonan*, 242 S.W.2d 599, 603 (Mo.App., W.D.1951). Proof of the cost to repair should be reasonably certain and definite. *Dimick v. Noonan*, 242 S.W.2d at 603.

In the case at bar, MHC failed to establish the full and complete cost of repairing the property. Appellant indicated that the cost to cure, including a retention wall, restoration of the yard, and reinstallation of the fence, would be $5,500.00. However, this cost assessment did not include restoring the lost trees or landscaping.

Respondent's witness, Shirley Hobart, a real estate broker, testified that the fair market value of respondent's property had decreased from $45,000.00 before the damage to $15,000.00 subsequent to the damage. Evidence was also offered to show that an undetermined number of trees had been lost due to the erosion of the creek bank. The evidence indicated that the damage was permanent and not temporary and affected a substantial amount of the value of the entire property.

Thus, where the evidence indicated that the damage was not temporary but permanent and affected a substantial degree of the value of the entire property, and where appellant failed to establish a definite, certain cost of repair, it would have been improper for the court to have given appellant's proffered instruction which limited damages to the cost of repair. This point is denied.

In appellant's third point, it claims that the court abused its discretion and committed prejudicial error in refusing to admit evidence of average rainfall amounts and other rainfall data. Appellant argues in its brief that such refusal precluded it "from establishing the dramatic cumulative increase in water table level and saturation of the soil, the timing of the slide activation, and the reason for the increased water level in the drainway."

The determination of whether proffered evidence is relevant is within the sound discretion of the trial court and its determination will be upheld absent an abuse of that discretion. *City of Cape Girardeau v. Robertson*, 615 S.W.2d 526, 531 (Mo. App., E.D.1981).

Appellant contends that the rainfall data and average rainfall amounts are relevant proof of increased rainfall and consequent increased soil moisture in the years after 1981. The trial court sustained an objection to the proffered evidence on the basis that it was a narrative climatological summary. Although the actual data for the years 1951 to 1980 may have been available, appellant insisted on the relevancy of the comparative, average figure.[1]

We believe that the lower court did not abuse its discretion in refusing to admit the narrative summary report. Actual annual rainfall figures from the St. Peters Weather Station for the years 1980 through 1984 were admitted into evidence. An average of the normal annual rainfall for the St. Louis area, calculated on the basis of the years between 1951 and 1980, would in all likelihood have confused the jury in its assessment of the relevancy of the evidence. *See Hungate v. Hudson*, 185 S.W.2d 646, 648 (Mo.1945). Nor do we find prejudicial error. The trial court cannot be considered to have curtailed appellant's right to introduce relevant evidence or develop testimony on the issue of what caused respondent's damage. Appellant's experts were able to testify as to their theory about the cause of the damage. Further, the proffered evidence was cumulative in that the actual rainfall amounts from the St. Peters Station for 1980 through 1984 were admitted. This point is denied.

Finding no points of error, we affirm the trial court's judgment.

SIMON and STEPHAN, JJ., concur.

---

1. The transcript contains the following:
   [The Court]: ... This is a report giving some conclusions as to the normal annual precipitation for the St. Louis area. Do they have the actual data for those years of '51 through '80?
   [Counsel]: Yes.... It is the average, in fact, that is important to me.
       *    *    *    *    *    *
   [The Court]: Do you have any of the actual figures from '51 through '80 as to what the annual precipitation was?
   [Counsel]: This is a certified copy from them.
   [The Court]: ... My question is: Do you have those actual figures for '51 through '80, a summary like this, in stating an average? ... we don't know what the exact figures are during that time frame.
   [Counsel]: But the relevance here is not that but rather that over that period of time the average was 34 inches....