[1] Respondent (as plaintiff below) brought this suit November 3, 1945, to recover damages claimed to have been sustained by him in the erosion and other injuries to the soil of his farm by the overflow of flood water from the Osage River, which overflow and injuries the plaintiff claimed were caused by the effect of the maintenance and operation of the defendant's dam across the Osage River known as "Bagnell Dam". The verdict and judgment were in plaintiff's favor in the sum of $1500. Defendant appealed.
[2] The substance of the amended petition is that the maintenance and operation of defendant's dam "held back, impounded, retarded and slowed down" the natural flow and current of the Osage River, and caused the water in said river and its tributaries to back up, overflow and to fill up the natural channels thereof, and to overflow the adjacent premises, thereby creating the large body of water known as "The Lake of the Ozarks"; that such slowing down of the current of said river has decreased the carrying capacity of its water, causing the water to deposit large quantities of silt, clay and other materials along the banks of its channel, thus narrowing and shallowing the channel so that the water is caused to spread out and over the lands and to damage the same; that in May, 1943, the water of the Osage River and of the lake aforesaid were thus caused to *Page 14 
back up and overflow the plaintiff's lands, and to stand thereon; that the channel of the river along the boundary of said farm was bank full of silt, debris and water with little or no current; that the water from the natural water channel drained by the Osage and its tributaries, including plaintiff's farm, were by reason of such narrowed and shallowed beds and channels caused to back up and to overflow the plaintiff's farm; that water from increasing rainfalls there, by reason of the conditions aforesaid, caused the river to divert from its natural channel and to flow over and across the plaintiff's land to wash away the top soil, cut ditches thereon, and to deposit large quantities of silt, sand, clay and other materials thereon, and to stop the drains on such land, causing it to become wet and swampy; that by reason of the aforesaid conditions plaintiff's farm was damaged and the reasonable market value thereof depreciated in the amount of $13,000. It is alleged that the overflow and damages described were proximately caused by the operation and maintenance of said dam and obstruction by the defendant. It is further alleged that the defendant has an easement on the plaintiff's said farm to the height of 673 feet above sea level, but that the damages complained of were on land above said elevation.
[3] The answer pleaded the easement mentioned in plaintiff's petition and claimed that no damage was done to plaintiff's land above that elevation, and further averred that the damage, if any, was due to an unprecedented rainfall, and was an act of God. It alleged further that since 1931, defendant has owned and operated the dam at Bagnell, which was a permanent dam over the Osage River, and constructed under Federal authority; that any cause of action plaintiff may have had by reason of such dam is barred by the statute of limitations. Section 1014, R.S.Mo. 1939, Mo.R. S.A. Defendant also pleaded that full compensation had been paid to plaintiff for any damages sustained in May, 1943, by and through a condemnation suit awarding the said easement to the defendant on plaintiff's land up to 673 feet.
[4] The reply, in effect, was a specific denial of the special defenses pleaded in the answer.
[5] The Osage River rises in east central Kansas, crossing into Missouri on the west boundary of Bates County, whereupon it follows a meandering course southeasterly to Osceola in St. Clair County, where it turns northeasterly and in a very circuitous course flows to Warsaw. From that point prior to 1931, it pursued its very irregular but generally eastward course through parts of Henry, Morgan, Camden and Miller counties to a point near Bagnell, from whence it continued its present northeastern course to a point a short distance east of Jefferson City, where it emptied into the Missouri River.
[6] In 1931, under federal authority and license, there was constructed and assigned over to the defendant a huge concrete dam across the Osage River near Bagnell to be used to generate electrical energy. The dam is 2560 feet long, extends from bluff to bluff across the valley and is 148 feet in height. It is 150 feet wide at its base and 25 feet wide at the highway level on top. It has 12 steel gates to pass the excess water, and contains a power plant. The effect of the construction and maintenance of the Bagnell Dam was to create a reservoir or lake of 60,000 acres at a level of 660 feet above sea level. Water above the dam was thus checked, caused to spread out over the bed of the valley and a myriad of multiform projections of the lake were forced into the draws and around the hills of the vicinity of the Osage valley. The normal pool thus created extends as far as the County Line Bridge, 12 miles above the plaintiff's farm. The tributaries of the Osage River above the dam were also likewise affected. The original channel of the Osage thus practically lost its apparent identity as far up the river as Warsaw and some miles beyond.
[7] Through a condemnation proceeding the defendant had acquired an easement permitting it to flood the lands to be inundated by the lake project to certain determined levels, and at the plaintiff's farm this easement extended to 673 feet above sea level. *Page 15 
[8] Plaintiff's farm is located 20 miles up the Osage River from Warsaw, and 114 miles above the defendant's dam at Bagnell. The river approaches the plaintiff's farm from the southwest and makes a sharp "horseshoe" turn around the north and east sides of the tract, whence it proceeds on its crooked course down toward Warsaw. The farm consists of 251 acres, of which 75 acres are first and second bottom land, and the rest is upland on which the improvements are located. Of the 75 acres in bottom land, all but two acres lie above the 673 foot elevation to which the defendant holds its easement. The fall of the Osage River at plaintiff's farm averages .8 of a foot per mile.
[9] Evidence produced by the plaintiff tended to prove further facts as follows: The plaintiff's bottom land lies on the northwest corner of his farm. Along most of the west line of the farm there is a high bluff which is the east bank of the Osage River. The farm at that point slopes to the east. Before the dam was constructed, the Osage River was clear and passed the farm with a strong current. After the dam was constructed, the river at the farm became muddy and there was little or no current there. Silt began to appear along the borders of the river and in mouths of the sloughs which drained into the river between the farm and Warsaw. These silt deposits increased each year from the time the lake was filled and became more apparent in 1934 and 1935. In March or May, 1935, plaintiff first noticed that his farm was being flooded above the 673 foot elevation because of the existence of the dam. In that connection the plaintiff was asked:
[10] "Q. Now when was it that you first noticed, after this lake was formed there, that you were getting floods above the elevation of 673 feet because of the existence of this dam? A. Above the 673 feet? The first time was in 1935.
[11] "Q. In 1935? A. Yes; the high day was the 30th of May, that year.
[12] "Q. In 1935? A. 1935, yes.
[13] "Q. And you attributed that overflow, did you, to the presence of the dam. You said that was caused by the dam? A. Yes, sir, I say that".
[14] Plaintiff came to Kansas City in July, 1935, and complained of the flood condition to an attorney for the defendant. Plaintiff testified:
[15] "Q. And at the time you went up there to see him, did you complain then that the dam was causing the overflow of your property above 673 feet? A. Sure. And he promised he would write to the company and see if he could get an adjustment for me of any kind".
[16] Being later recalled to the stand plaintiff was asked by his counsel whether he had complained in 1935 to the attorney for the defendant regarding any loss to the soil, and the plaintiff testified that he complained only at that time of loss of crops. It does not appear that plaintiff pursued his claim further at that time.
[17] Plaintiff's further evidence was to the effect that on no occurrence of flood on his land prior to 1943 had the river broken over the west part of his farm or washed away the soil or deposited sand thereon. The previous floods were caused by the backing up of the water from the lower end of the farm. Beginning in the latter part of April, 1943, it rained steadily for eight or nine days. Then ensued an interim of several days without rain. During that lull in the rainfall, the river at plaintiff's farm was bank full with practically no current, the water being muddy and overflowing into the plaintiff's farm. Following that interim the rains resumed and continued four or five days. On or about May 15, the river broke over its east bank on the west part of the northern portion of the plaintiff's farm and ran through and across his field into the channel at the lower end thereof, with such force that it could be heard by witnesses. This condition continued for about ten days. The flood level reached 19 feet above the 673 foot elevation on the plaintiff's field. With the exception of three or four acres of the bottom land on plaintiff's farm, the top soil was thus washed off and the drain at the lower end of his filed was filled up with sand and debris. *Page 16 
[18] The plaintiff produced evidence that at some places above the dam there were deposits of silt 20 feet deep in the river channel. At Warsaw there was little or no current at the time in question and silt was seen near the bridge there 15 to 20 feet in depth. The mouths of the sloughs and tributaries emptying into the river between plaintiff's farm and Warsaw were clogged with silt, in some places 20 feet in depth. In the channel between plaintiff's land and Dean Island there were silt deposits as deep as 12 feet in places and extending above the water in strips 40 or 50 feet wide, and 600 feet long near the plaintiff's farm. Experts gave it as their opinions that by reason of the dam, heavy silt deposits had been caused to lodge and accumulate in the river channel and on the banks of the lake between Warsaw and plaintiff's farm, thus raising the flow of the channel and backing the water to and along plaintiff's farm so that, in such condition, when the rainfall resumed, the river was caused to leave the channel and force its way over the west bank on the farm and to run over and across it, as described. Because of the silting the water rose ten or fifteen feet higher on plaintiff's farm than it otherwise would have risen. The experts testified that the factor of the runoff facilities was more important than the amount of rainfall.
[19] There was further evidence from lay witnesses that rains in 1895, 1927, and 1935 were heavier than the rainfall in April and May of 1943. Their evidence was further that the river rose to a higher level in 1943 than at any previous date. Shrubbery, which had been removed for the purposes of the lake, had in many places grown up thicker than before, and in places was 20 feet high. The flood of 1943 washed a strip on the plaintiff's farm 50 feet wide, 600 feet long and about 3 1/2 feet deep between the first and second bottom lands, and sand was scattered over the rest of that portion of the farm except 3, 4, or 5 acres. The drain is left wet and soggy.
[20] Missouri Highway 35 and Highway 65 cross the Osage bottom at Warsaw below the plaintiff's farm and in flood times have some effect in slowing down the flow of water.
[21] Before the 1943 flood plaintiff raised corn on his bottom land and at times produced 40 or 50 bushels to the acre. In 1946, it produced 10 to 20 bushels to the acre. There was evidence that the value of the farm prior to the 1943 flood was from $18,000 to $19,000, and thereafter its value was from $6000 to $9000.
[22] In substance the defendant's evidence was that the rainfall in the valley of the Osage above the plaintiff's farm in April and May, 1943, was the heaviest on record. From Government weather reports and other sources the proof tended to show that the rainfall in that period in that vicinity was 11.47 inches as compared to 8.60 inches in May and June of 1935; 5.86 inches in April, 1927, and 5.28 inches in December, 1895. Prior to the construction of defendant's dam the plaintiff's property had been flooded from natural causes 14 times in the 15 years next preceding 1931. In 1943 the crest of the flood on the Webb farm reached 692 feet as against 678.8 in 1935, 682.1 in 1929, and 684.7 in 1895. The area claimed by the plaintiff to have been eroded in the 1943 flood was 683 feet above sea level. Other records tended to show that flood waters of 1943, as well as those of previous floods, flowed without obstruction between Brown's Ford, above the influence of the dam, and Warsaw. Witnesses said the silting at Warsaw was not sufficient to restrict the flow of the Osage so as to affect the plaintiff's farm 20 miles upstream, although it is the tendency for dams to cause silting and in the course of time will interfere with the natural flow of the Osage River, but there has not yet been sufficient accumulation to have that effect. Highway 65 and Highway 35 and the bridges at Warsaw and Heath Bridge, together with the fills thereat tend to slow down the stream and in flood time to raise the elevation of the water. An engineer testified that the crest of the flood of 1943 at plaintiff's farm would have been as high there if the dam had not been built. The effect of any silting in the channel between the banks of the river which may have *Page 17 
tended to raise the level of the water would have been offset by the spread of the flood plain of the river. Defendant's witnesses testified that from two to four acres of plaintiff's land had been eroded, and about one-half to one acre had been covered by sand. In their opinion the property damage to the plaintiff's farm had been from $200 to $1000 by the 1943 flood.
[23] At the close of all the evidence, the defendant moved for a directed verdict, which was overruled.
[24] Appellant's first point of error is that the respondent's cause of action is barred by the Statute of Limitations.
[25] Defendant pleaded that it had operated and maintained the permanent structure and equipment constituting the Bagnell Dam since October 16, 1931 "and that any cause of action plaintiff claims to have against the defendant by reason of such construction, maintenance and operation of said dam is barred by the provisions of Section 1014, R.S.Mo., 1939 [Mo.R.S.A.]". Respondent contends here for the first time that the defense of limitations was insufficiently pleaded; that "obviously" the theory of the defendant's answer is that the cause of action, if any, arose at the time the lake was filled and not when the plaintiff first sustained damages therefrom; that the answer fails to allege the date when substantial damage occurred from which the injuries could be ascertained. Section 1014 bars actions of the kind described in the petition if not brought within five years after accrual. Section 1012 provides that, for the purpose of the limitation statute in question, the action shall not be deemed to have accrued until the damage is sustained and capable of ascertainment. The answer was not attacked below for insufficiency in respect to the plea of limitations. No objection was made at trial to questions and answers pertaining to that defense, and, in fact, the plaintiff resumed the stand to testify further regarding his damages in 1935, evidently to meet the defense of the five year statute. Under the circumstances and under the present code of procedure we rule that the defense of limitations was sufficiently pleaded in the answer. Civil Code, §§ 847.35 and 847.82, R.S.Mo. 1939, Mo.R.S.A.
[26] Was this action barred by the statute of limitations as pleaded? It cannot be disputed that the huge concrete Bagnell Dam when constructed, operated and maintained, became a permanent obstruction in the Osage River. It was and is as permanent as the ingenuity of man can make it. Nor can it be disputed that it was placed, constructed, maintained and operated under the right of eminent domain and under legal authority and license. It is admitted that by condemnation the defendant acquired an easement over plaintiff's land for purposes of the effects of the dam, to the extent of 673 feet above sea level. It did not, of course, acquire thereby any such rights above that elevation, nor has plaintiff been compensated for any damages sustained by him and claimed to have been caused by the dam above that elevation. The plaintiff claims that he has since sustained permanent damage to and depreciation of the market value of his entire farm by the overflow of the river above the 673 foot elevation caused by an accumulation of silt deposits which, in turn, were caused to accumulate by the existence and operation of the defendant's dam. When did his cause of action therefor arise? He testified that there were no silt deposits before the dam was built, but in March, 1935, he noticed silt in a ford a mile from his farm; that between that time and 1943, he noticed silt deposits around his farm "all down past the lower part of the farm plenty piled at Dean Chute up there — that is the first water we had after they built the lake". His son, who had been farming the place for him since 1930, testified for the plaintiff and said that after the lake was filled, he noticed silt along his father's farm; that it had gradually filled in; that he first noticed the silt there in 1933 and 1934, but it was heavier in 1934, although he had noticed some "settlings" from the time the lake was filled. The plaintiff, again taking the stand, testified that he first noticed that he was getting flood above the 673 foot flood elevation "because of this dam" in 1935. "The high day was the 30th of May, that year". *Page 18 
[27] "Q. And you attributed that overflow, did you, to the presence of the dam. You said that was caused by the dam? A. Yes, sir. I say that".
[28] In July of that year the plaintiff made claim of the defendant's attorney for loss to his crops that year. That claim, as far as the record shows, was not pursued.
[29] It appears, then, that in March or at least in May, 1935, plaintiff had notice that his farm, above the 673 foot elevation, was subject, vulnerable and liable to permanent injuries from overflow and flooding by reason of the defendant's dam, a permanent, unabatable obstruction owned, operated and maintained under right of eminent domain, and by July of that year had suffered the loss of that year's crop because of the dam. The damage that year was attributed to the same cause as that to which the plaintiff attributes the damages he seeks herein. The fact that in 1943, the conditions had gradually grown worse since 1935, or the area overflowed was greater, or the damage more extensive, or injured the soil and not merely the current crop, did not change the identity nor the permanency of the cause of the damage.
[30] In Smith v. Sedalia, 244 Mo. 107, 149 S.W. 597, 599, the city had brought a sewer to within 200 yards of the plaintiff's farm and the sewage emptied into and polluted a stream which traversed the farm. Plaintiff brought suit for the rental value of the farm and for depreciation of the value of the farm. This suit, after several retrials, was allowed to lie dormant. Some years later the plaintiff brought another suit, alleging substantially the same injuries. As to whether the latter suit was barred by the pending prior suit depended, the court said, "upon whether the [first] injury * * * was permanent in character". The incidental increase in the use of the sewer by the increase in population did not affect the character of the injury, the court said. The court held, 244 Mo. at page 119, 149 S.W. at page 599: "If condemnation proceedings had been instituted in 1895 to acquire the use of this stream, the damages would have been fixed for all time, notwithstanding the impossibility of ascertaining at that time the extent of future use that might be made of the sewer. For this reason, the damages would necessarily be to some extent conjectural; but that fact would not deprive the city of the right to condemn, nor prevent the ascertainment of final damages."
[31] And 244 Mo. on page 122, 149 S.W. on page 600: "This suit is not grounded upon trespass merely, nor upon nuisance, although the injury takes the form of a nuisance, but upon the constitutional right to compensation for property damages for public use (citations); and it is so argued in plaintiffs' brief. The city, by proper proceedings to that end, had the right by statute to secure the use of this stream for sewer purposes. The city did not condemn, but appropriated the use. Such action, however, does not deprive the plaintiff of his right to compensation; nor does it effect the measure of damages, which, for such use by the city whether by condemnation or appropriation, is the diminution in market value of the land damaged."
[32] The court held the case was barred by the pending suit because the injuries claimed in both cases were permanent in nature.
[33] Riggs v. Springfield, 344 Mo. 420, 126 S.W.2d 1144, 1150, 122 A.L.R. 1496, was another suit for damages caused by sewage from the municipal sewer system emptying into and polluting a creek which ran across plaintiff's farm. The city had not condemned any property right of the plaintiff. The court said that had the city condemned, "the damages would have been fixed then, as best could be done, for all time." In a suit by a landowner upon the appropriation of his land, the court said, the cause arose at the time the land was subjected to the said permanent and wrongful appropriation. "A similar rule", the opinion states, "is applicable to permanent nuisances. `The cause of action accrues in such cases against the party erecting the permanent nuisance, and in favor of the owner of the land at the time of such erection or the first resulting injury.' (Citing cases.)"
[34] In Stewart v. Springfield, 350 Mo. 234, 165 S.W.2d 626, the plaintiffs there also sued for damages to their lands because of *Page 19 
pollution of a creek by a discharge of the effluent from the municipal sewer of defendant. The court held that the law of eminent domain applied; that the city had a right to appropriate an easement for the discharge of its sewage, and where it had been done so without condemnation, the landowner claiming damages thereby must recover therefrom in one action when the injury became apparent, citing the rule in permanent nuisance cases. The court further said, 350 Mo. at page 249, 165 S.W.2d at page 631, that while it is true a nuisance is deemed temporary if it can be abated, yet, by a consistent line of decisions in this state this rule has been held inapplicable to municipal sewer systems, which have consistently been found to constitute permanent nuisances; that — "Therefore, full damages for the permanent injury must be assessed in one action." The court held the suit barred by the statute of limitations because the alleged cause of the damages was a permanent one and had existed for a time in excess of the limitation period.
[35] The law on this question is exhaustively reviewed by the Springfield Court of Appeals in Hayes v. St. Louis S. F. Railroad Co., 177 Mo.App. 201, 162 S.W. 266. There the plaintiff sued defendant railroad for damages to his farm and crop alleged to have been caused by the railroad embankment causing the water to back up and overflow the land. He recovered only on his third count, which was for damages to the crop for the year 1910, due to an overflow from the same cause. The five and ten year statutes of limitations were pleaded in the answer. The first and second counts of the petition on which he did not recover, were based on loss of crop for 1905, and loss of use and enjoyment of the property for the preceding six years, respectively, all attributed to the same cause. The sole question was the determination of whether or not the cause of action stated in the petition was barred by limitation. The court said that the determination of that question depended upon the further question whether the injuries complained of in the third count belonged to the class of permanent injuries to the land — "* * * which accrue once for all to the then landowner as a single cause of action by the erection of a structure permanent in its nature, and which must be redressed, if at all, by a single action brought within the limitation period, or to that class of injuries, temporary and continuing in their nature, where each successive injury is severable, and constitutes a distinct cause of action, accruing at the time of the particular injury, and which may be sued for within the statutory period after such accrual". 177 Mo.App. at page 208, 162 S.W. at page 268.
[36] The court cited authorities to the effect that if the cause of the damage is of a continuing or abatable nature, each injury gives rise to a new cause of action and successive actions may be maintained for damages accruing from time to time, but that — "Statutes limiting the time within which actions may be brought apply to actions for damages for nuisances, and where the nuisance is of a permanent character the period runs from the time when the injury was done or the structure complained of erected; but where the nuisance is a continuing one an action for injuries from the continuance may be brought after the lapse of more than the statutory period since the creation of the nuisance, although in such case the recovery is limited to damages for the statutory period preceding the commencement of the action."
[37] The court pointed out that "continuing" injuries in the sense there used meant temporary or abatable injuries. The court further said: "Then it should be borne in mind that it is thecharacter of the source or cause of the injury as to beingpermanent or temporary rather than the character of the injuryitself that determines to which class it belongs." (Italics ours.)
[38] And, 177 Mo.App. at page 209, 162 S.W. at page 268, the court said: "The permanent injury, a cause of action for which is single, and accrues once for all, may be permanent either from the inherent nature of the injury itself, as going to the destruction of the estate or its beneficial use, or from the nuisance or cause of the injury being permanent. The effect is permanent *Page 20 
whether arising from a single act or from a constantly recurring series of acts from the same permanent cause."
[39] As to whether the first injury did not go to the destruction of the estate, but to a lesser damage, in order to give rise to a suit for permanent damages, the court pointed out, 177 Mo.App. at page 209, 162 S.W. at page 269, as follows: "By this, however, it is not meant that the land itself must be destroyed, in whole or in part, as by washing away the soil, or covering it with gravel or rock. The beneficial use is destroyed by flooding it with water, or turning loose noxious gases thereon, just as effectually as by either of the other methods just suggested. Moreover, the result is the same whether the water stands on the land all the time, recurs at frequent intervals, or only at such intervals as renders the growing of crops thereon impossible or precarious. The difference is in degree only. If the cause of the flooding be permanent, this of itself renders the result permanent, though arising at more or less rare and irregular but surely recurring intervals".
[40] For the authority the court here cited and quoted from Powers v. St. Louis, I. M. S. Ry. Co., 71 Mo.App. 540, and Powers v. St. Louis, I. M. S. Ry. Co., 158 Mo. 87, 97, 57 S.W. 1090. In discussing those authorities, the court in the Hayes case said, 177 Mo.App. at page 211, 162 S.W. at page 269: "It is readily seen that a permanent injury may be caused by a purely temporary or abatable nuisance, as the washing away of soil, etc. On the other hand, the injuries in themselves may be purely temporary, as drowning out or washing away of crops, discharge of sewage or noxious gases, etc., and are permanent only because the nuisance causing same is permanent. The injuries themselves would terminate with the cause; but, the cause being permanent, the injury is permanent."
[41] The court further quoted with approval from Bunten v. Chicago R. I. P. Ry. Co., 50 Mo.App. 414, (177 Mo.App. at page 212, 162 S.W. at page 269), as follows: "`It seems definitely settled, upon authority, that, where the nuisance consists of a work or erection which is permanent in its character, and which is necessarily injurious, the whole injury arises generally upon the completion of the work, the entire damage, present and prospective, accrues at once, and is the subject of a single action which must be brought within the period of limitation from the erection of the nuisance.'"
[42] The court, however, points out that if the nuisance is on one's own land and does not of itself work the injury when erected, "then the limitation will not begin to run until the first injury happens, and he who owns or maintains it at that time will be liable." Citing further from the Bunten case, the court in the Hayes case quoted, 177 Mo.App. at page 213, 162 S.W. at page 270: "`The wrong was upon defendant's own land, and originally consisted in allowing the bridge to become choked, and continuous actions might have been brought (on damage happening) for the continuous wrong, for it was yet a wrong which defendant might be expected to cease doing. But when it became fixed and permanent, * * * as a railroad embankment, it became necessarily injurious. * * * At that time it could as well be seen that future damages would follow from the flowing of high waters as that rain would fall. Defendant was then at that time liable for the present and prospective damage, and such could have been recovered by plaintiff in one action. The statute of limitations, therefore, began to run at that time on plaintiff's whole damage, present and prospective.'"
[43] In the Bunten case, so said the court in the Hayes case, 177 Mo.App. at page 214, 162 S.W. at page 270: "* * * the court held that the damages resulting from flooding land, whether as permanent injury to the land or as destroying crops from year to year, could not be recovered in an action brought more than five years after the railroad embankment causing the same became a completed structure." The court cites and quotes at length from other cases in this and other states, among them Ridley v. Seaboard Railroad Co., 118 N.C. 996, 24 S.E. 730, 32 L.R.A. 708, (177 Mo. App. at page 216, 162 S.W. at page 271), *Page 21 
where that court said that in such cases where the cause is a permanent one "The statute of limitations begins to run in such cases, not necessarily from the construction of the road, but from the time when the first injury was sustained." "In fact", said the court, "all the cases cited and approved by the Supreme Court as the basis of its decision in Powers v. St. Louis, I. M. S. Ry. Co., supra, announce this doctrine."
[44] In conclusion on that point the court in the Hayes case, supra, 177 Mo.App. at page 219, 162 S.W. at page 272, said: "There can be no doubt that, where the cause or source of the injury is permanent and nonabatable and the resulting damages go to the total or partial destruction of the land, or continuously prevent its beneficial use, in whole or in part, as by washing away the soil covering the same with rock, constant flooding of land or mines, continuous discharge of sewage, noxious gases, etc., then the cause of action accrues once for all, and must be sued for in one action within the statutory period of limitation. The authorities are practically unanimous to this extent. And it follows as a corollary to this that the cause of action accrues in such cases against the party erecting the permanent nuisance, and in favor of the owner of the land at the time of such erection or the first resulting injury."
[45] As final authority the court cites 2 Farnham on Waters, p. 860 as follows: "If a permanent obstruction is erected so that it casts water across the boundary line onto the land of the upper owner, the injury is complete at the time the obstruction is erected and the injury done, and there is no ground for holding that a right of action for damages may be carried along for a period of 20 years when the statute of limitations says that it shall be barred in 6 years. The only logical rule is that, if the upper owner wishes to recover damages for his injury, he must bring this action within the time named by the statute of limitations."
[46] Respondent in the case at bar further contends that his cause of action here is for tort in the nature of trespass. Kennedy v. Union Electric Co. of Mo., Mo.Sup., 216 S.W.2d 756. Granting that the instant case partakes of the nature of trespass, we cannot see why the rule, nevertheless, should not apply where a single action is required for permanent damages arising from the same permanent cause as here.
[47] Applying the law to the circumstances and facts at hand, we are forced to the conclusion that plaintiff's cause of action for permanent injuries to his farm because of the defendant's dam, and conditions resulting therefrom, arose not later than in May, 1935, when he had full notice, by his injuries that year that his land was subject, vulnerable and liable to present and future floods and damages by reason of the permanent cause thereof, to-wit, the existence, construction, operation and maintenance of the defendant's Bagnell Dam. Since this suit was not instituted until November 3, 1945, it is evident that it was not instituted within the five year period of the statute pleaded, and is therefore barred thereby.
[48] Appellant presents other points for our review but which, in view of the foregoing disposition of the entire case as barred by limitation, we deem it unnecessary to consider.
[49] The judgment of the trial court is reversed. It is so ordered.
[50] CAVE, J., concurs in separate opinion.
[51] VANDEVENTER, J., sitting by order of Supreme Court, concurs.