**E. W. HILLHOUSE and Pauline Hillhouse, Plaintiffs-Respondents,**

v.

**CITY OF AURORA, Missouri, a municipal corporation, Defendant-Appellant.**

**No. 7704.**

Springfield Court of Appeals.
Missouri.

Oct. 17, 1958.

William A. Ratican, Jr., J. Hal Moore, Aurora, Royle Ellis, Cassville, for defendant-appellant.

Lincoln, Lincoln, Haseltine, Forehand & Springer, Springfield, Edwin W. Mills, Osceola, William Pinnell, Monett, for plaintiffs-respondents.

STONE, Presiding Judge.

Defendant, City of Aurora, Missouri, appeals from a judgment for $6,600 entered upon a jury verdict in favor of plaintiffs, E. W. and Pauline Hillhouse, for damages sustained during 1955, 1956 and 1957 on account of the pollution of Chat Creek by sewage from the Aurora sewer system.

Chat Creek is a small branch which rises in an old mining area (now abandoned) just east of Aurora and (when running) flows in a westerly direction through the city. In 1923, defendant established and constructed a municipal sewer system, from which raw sewage drained into a large, covered septic tank and, from that tank, into Chat Creek near the west boundary of Aurora. The undisputed evidence was that this discharge of raw, untreated sewage into Chat Creek continued until 1934, when defendant constructed (about one-quarter mile downstream or to the west) and placed in use a sewage disposal plant described as "the Imhoff tank trickling filter type," which likewise drained into Chat Creek. The same disposal plant, with "major repairs," has remained in operation to date.

Plaintiffs' 114-acre farm is about two miles directly across the fields, but about three miles by the meanderings of Chat Creek, west of and downstream from the disposal plant. Plaintiffs' evidence concerning the condition of the creek covered the period since October 1935, when E. W. Hillhouse, then seventeen years of age, moved onto the farm with his parents. After his father's death in 1940, Hillhouse farmed the land under an agreement with his mother that, if he would pay the loan on the farm, she would convey it to him. Pursuant to that agreement, he paid the loan in 1943, and he and Pauline (whom he married that year) became the beneficial owners of the farm and used it as such until record title was conveyed to them in April 1954. Prior to July 2, 1955, when they moved from the farm because "we were afraid to live there" on account of the foul odors emanating from, and the swarms of mosquitoes and flies bred in, the sludge-polluted creek, the Hillhouse family (comprised of plaintiffs, their son, and the mother of E. W. Hillhouse) occupied a two-story, five-room brick house situate about one hundred seventy-five feet north of the creek.

Plaintiffs' evidence (not seriously controverted by defendant) was that, during the period from 1935 to 1946, Chat Creek (as it flowed through plaintiffs' land) was a clear, sparkling, odorless, running stream in which perch and minnows abounded; that, about 1946 or 1947, the water in the creek "began to darken," a foul odor first became apparent, and fish disappeared from the stream; and, that thereafter the water gradually darkened in color until it became "black, grayish, slimy looking" and the odor gradually became more pungent and offensive until it was "similar to a toilet." Sludge, defined in the record as "solids that are present in sewage," became noticeable in the creek at plaintiffs' farm about 1951 and thereafter increased in volume until (as one witness described it) the creek was

"filled with foul smelling sludge" in June 1955.

Defendant's counsel emphasized throughout the trial that the condition downstream from the disposal plant was much worse when the creek was low, and the aggravated situation at plaintiffs' farm during the period from 1953 to 1957 was attributed to the droughts in those years. However, defendant's own evidence confirmed that, during the period from 1934 (when the disposal plant was constructed) to 1957, there had been an important and substantial increase in the volume, and (due to "industrial waste") a material and significant change in the type, of the load imposed on the municipal sewer system and disposal plant. And, the Mayor of defendant city frankly conceded that recommendations by engineers employed by the city in 1951 that the city "remodel the old plant and perhaps add to it" were not carried out in their entirety because the city "fell out with the engineers, lost faith in them, and dropped it, and couldn't do any more until 1956, until their contract expired," and readily agreed with plaintiffs' counsel that, during the period for which damages were sought, the city had been operating an inadequate plant—"the town had outgrown it"—with the volume of sewage gathered in the municipal sewer system being two and one-half times the capacity of the disposal plant.

Only one person, Bill Basham (a witness for defendant), testified concerning the condition of Chat Creek in the neighborhood of plaintiffs' farm prior to 1935. Basham, a farmer residing one-quarter mile north of the disposal plant (and thus upstream from plaintiffs' land) had lived on the creek since 1912. He said that "we had plenty" of raw sewage in Chat Creek "back in the twenties" and "in * * dry years * * * we had an awful odor," but that, when the disposal plant was constructed in 1934, "it took care of it for a long time, we didn't even notice it * * * up into the forties then, '46 maybe," when "it got bad, something went wrong with the sewer, and we got onto them about it and they fixed it, and it was all right for quite a while." When asked about odors (inferentially foul) in "Mr. Hillhouse's area," Basham stated that he first smelled such odors "back there in the twenties" while plowing "just across the road east" of the farm now owned by plaintiffs; and, in response to the question, "considering the area from your land down to Mr. Hillhouse's land, and considering that period, first of all, up until the time of the building of the disposal plant, and considering the same situation after the building of the disposal plant up to the present date, can you compare those two periods," Basham answered without objection, "well, up to the time they built the plant it was worse than it has been since they built the plant, only a few times there during the drouth, that is the way I would put that."

The only expert witness was Clifford L. Summers (called by plaintiffs), assistant chief of water pollution control with the Missouri Division of Health since 1950, who painted a graphic word picture of the inadequacy of the Aurora disposal plant and the gross pollution of Chat Creek as far downstream as plaintiffs' farm at the time of his last plant inspection in May 1955. Summers branded "the Imhoff tank trickling filter type" of disposal plant in operation at Aurora as "one of the older types of treatment plants," limited in the type of waste it can treat. "The modern type plants that we use now" have been available "probably thirty years"—since 1925 or 1930. So, when plaintiffs' counsel propounded the leading question, "then it has not been necessary for any city, such as Aurora, to pollute a stream since 1925 or '30," this witness agreed "that's right."

From the outset of the instant case, the adversary parties have urged and followed divergent theories, with the controversy swirling about two basic issues, i. e., (1) whether the nuisance created by defendant's sewer system and disposal plant was, as to plaintiffs' farm, a permanent or a temporary nuisance, and (2) whether the cause of action for damage to said farm ac--

crued "in the twenties" or about 1946. *Plaintiffs* earnestly insist that damage to their farm first became apparent about 1946, that the nuisance then created by defendant clearly was a *temporary* or *abatable* one, and that they have a right to pursue this action for damages accruing within five years prior to institution of suit. *Defendant* just as earnestly contends that, regardless of whether the damage to said farm first manifested itself "in the twenties" (as defendant asserts) or about 1946 (as plaintiffs say), it resulted from a *permanent* nuisance created in 1923 when defendant constructed a permanent sewer system with outfall into Chat Creek, and that, since the cause of action for damage to plaintiffs' farm accrued not later than 1946 (or 1947), recovery in this suit is barred by the five-year statute of limitations. Section 516.120, RSMo 1949, V.A.M.S.

For many years, the appellate courts of this state held consistently that a municipal sewer system constituted a *permanent* nuisance, and that all damages sustained by any riparian landowner had to be recovered in a single action under the law of eminent domain. Stewart v. City of Springfield, 350 Mo. 234, 249, 165 S.W.2d 626, 631(15), and cases there collected. However, as we observed, per Ruark, J., in Newman v. City of El Dorado Springs, Mo.App., 292 S.W.2d 314, 318,[1] "the reason for such rule was that when it came into being a municipal sewer *was* necessarily, because of the inherent nature of the operation, a permanent nuisance"; and, with appropriate recognition of scientific advances in the field of sewage treatment, we concluded in the Newman case [292 S.W.2d loc. cit. 318], and are still of the same opinion, that "it should not be said (as an all-inclusive statement) that the inevitable, necessary and inherent result is a nuisance to the land below, except the lands in the vicinity thereof and such as will, in reasonable contemplation, be permanently affected by it." But,

we here hasten to point out that, in the Newman case, we neither held nor intended to suggest (as counsel for instant plaintiffs apparently believe) that *all* nuisances created by *all* municipal sewer systems constructed since 1911, when the first Imhoff tank is said to have been installed [see Riggs v. City of Springfield, 344 Mo. 420, 436, 126 S.W.2d 1144, 1152, 122 A.L.R. 1496], are to be considered, without regard to the facts and as a matter of law, as temporary and abatable nuisances.

In the Newman case, the disposal plant, which upon completion actually abated the nuisance, "was in partial operation" [292 S.W.2d loc. cit. 316] when the nuisance as to plaintiffs' land was created in 1952, and abatement of the nuisance was a fait accompli when plaintiffs' suit for damages was tried. Thus, we pointed out [292 S.W.2d loc. cit 320] that there was "no indication that any part of the discharge of the sewer * * * ever reached the plaintiffs' land prior to the year 1952 or that, since the construction of the new plant, it ever will again." In short, the evidence in the Newman case established not only that it was *scientifically possible* to have abated the nuisance affecting plaintiffs' land but also that it was *reasonably practicable* for defendant so to do. However, the record in the instant case does *not* show that, when defendant's sewer system was constructed *in 1923*, it *then* would have been scientifically possible and reasonably practicable to have abated the nuisance resulting from discharge of raw sewage into Chat Creek, but (by the testimony of plaintiffs' witness Summers, to which we have referred) suggests to the contrary. In this state of the record, we are of the opinion that, if the cause of action for damage to the farm now owned by plaintiffs accrued when defendant's sewer system with outfall into Chat Creek was constructed in 1923 (or shortly thereafter "in the twenties"), such cause

1. Defendant's-appellant's application to transfer the Newman case was denied by the Supreme Court of Missouri on September 10, 1956, under its Case No. 45854.

of action would have been for damage resulting from a *permanent* nuisance, that the measure of damages would have been the diminution in the market value of the farm, and that the five-year statute of limitations would have begun to run when the cause of action accrued. King v. City of Rolla, 234 Mo.App. 16, 23–24, 130 S.W.2d 697, 702. See also Riggs v. City of Springfield, supra, and Smith v. City of Sedalia, 244 Mo. 107, 149 S.W. 597.

■ Of course, it could not well be said that defendant had appropriated "in the twenties" any right to maintain a permanent nuisance affecting the farm now owned by plaintiffs, or that any cause of action then accrued for damage to that farm, unless there was *then* some substantial, not merely technical, invasion of or intrusion upon the use and enjoyment of the farm.[2] Since (as hereinafter explained) we have concluded that the instant case must be reversed and remanded anyway and therefore additional evidence may be adduced upon retrial, we need not here determine whether defendant, by the fragmentary and inconclusive testimony of witness Basham, made a prima facie showing that there was "in the twenties" such substantial invasion of or intrusion upon the use and enjoyment of the farm now owned by plaintiffs. If, upon retrial, defendant can make a prima facie showing to that effect, the jury properly may be instructed that, in the event of an affirmative finding upon that issue of fact, plaintiffs' alleged cause of action would be barred and the verdict should be for defendant.

The record before us contains evidence (by plaintiffs' witness Summers) that "the modern type plants" required for satisfactory treatment of the volume and character of waste gathered in defendant's sewer system *in 1946* (when, as plaintiffs say, damage to their land first became apparent) then were "available." Thus, the jury was informed (and we are told) that it would have been *scientifically possible* for the nuisance alleged to have been created as to plaintiffs' farm in 1946 then to have been abated; but, absent any evidence bearing thereupon, the jury could not have known (and we may not say) that abatement of such nuisance then would have been *reasonably practicable. Possibility* and *practicability* may be poles apart. No sewage pollution case has been cited, and we have found none, in which any Missouri city either has been saddled with the positive duty to adopt and employ, in the treatment of its sewage, all scientific improvements and refinements immediately upon their discovery or development, or has been charged with absolute liability for failure to do all that might be scientifically possible at any given time, wholly without regard to reasonable practicability; and, we are unwilling so to broaden municipal duty and expand municipal liability.

■ Where riparian landowners seek to treat as temporary and abatable the damage resulting from operation of a permanent municipal sewer system, long regarded as creating and constituting a permanent nuisance [Stewart v. City of Springfield, supra, 165 S.W.2d loc. cit. 631(15) and cases there collected], and where the temporary

2. Newman v. City of El Dorado Springs, Mo.App., 292 S.W.2d 314, 319; Person v. City of Independence, Mo.App., 114 S.W.2d 175, 179; Fansler v. City of Sedalia, 189 Mo.App. 454, 176 S.W. 1102, 1104; 39 Am.Jur., Nuisances, § 141, p. 401; 18 Am.Jur., Eminent Domain, § 132, loc. cit. 757–758; Lewis on Eminent Domain (3rd Ed.), Vol. 1, § 65, pp. 56–57; Ibid., § 366, p. 668; Nichols on Eminent Domain (3rd Ed.), Vol. 3, § 8.5(1), loc. cit. 21. Consult also Riggs v. City of Springfield, 344 Mo. 420, 431, 435, 126 S.W.2d 1144, 1148(3), 1151–1152, 122 A.L.R. 1496; Hamer v. State Highway Commission, Mo., 304 S.W.2d 869, 871 (2); Rivard v. Missouri Pac. Ry. Co., 257 Mo. 135, 172, 165 S.W. 763, 772; Webb v. Union Electric Co. of Missouri, 240 Mo.App. 1101, 1121–1122, 223 S.W. 2d 13, 21; Hayes v. St. Louis & S. F. R. Co., 177 Mo.App. 201, 219–220, 162 S.W. 266, 272.

and abatable character of the nuisance and resulting damage is not conceded expressly or in necessary effect [contrast the Newman case, supra], we think that recovery by the landowners, as for damage resulting from a temporary and abatable nuisance, should be permitted only upon evidence from which the triers of the facts fairly and reasonably may infer, and actually do find, that it would have been both *scientifically possible* and *reasonably practicable* for the offending municipality to have abated the nuisance when the landowners' cause of action accrued. Compare Blankenship v. Kansas Explorations, 325 Mo. 998, 1016, 30 S.W.2d 471, 479(5, 6).

The instant case was submitted on the theory that the nuisance created by defendant's sewer system was a temporary and abatable one, and plaintiffs' principal instruction 1 (of which defendant complains) directed a verdict upon findings (a) that Chat Creek was "a permanent stream" through plaintiffs' farm, (b) that, in 1955, 1956 and 1957, defendant caused raw sewage, untreated sewage and partially untreated sewage "to be collected above plaintiffs' farm" and "to be drained into" Chat Creek, (c) that "through force of gravity said * * * sewage did flow down to and through plaintiffs' farm," and (d) that plaintiffs were damaged thereby. In the circumstances of this case, the giving of instruction 1 in effect directed a verdict for plaintiffs. Significantly, the jury was *not* required to find (a) *when* operation of defendant's sewer system had resulted in substantial invasion of or intrusion upon the use and enjoyment of plaintiffs' farm, or (b) whether it *then* would have been scientifically possible and reasonably practicable for defendant to have abated the nuisance. And, as we have pointed out, there was no *evidence* from which a finding of reasonable practicability could have been made anyway. That plaintiffs' instruction 1 in the case at bar was adapted from plaintiffs' principal instruction in the Newman case, supra, is not persuasive or significant here, for the simple but determinative reason that

the instruction in the Newman case was not attacked by defendant-appellant and therefore was not reviewed by this court. Furthermore, as hereinbefore noted, there was no live issue in the Newman case as to when the nuisance first affected plaintiffs' farm or as to whether it then would have been scientifically possible and reasonably practicable for defendant municipality to have abated the nuisance, for the nuisance had been, in fact, abated before trial by a plant which had been in the process of construction when the nuisance first manifested itself as to plaintiffs' farm.

 For the want of any evidence from which the triers of the facts fairly could have found that it would have been reasonably practicable for defendant to have abated the nuisance as to plaintiffs' farm in 1946 (when, as plaintiffs say, the use and enjoyment of their land first was affected), a submissible case was not made; and, even if a prima facie case on this disputed issue had been made, plaintiffs' principal verdict-directing instruction 1 was egregiously deficient and reversibly erroneous in the respects hereinbefore pointed out. However, we are mindful that the factual span in the instant case bridges the period of thirty-four years from 1923 to 1957—a period of transition and evolution in the treatment and disposition of municipal sewage during which "the modern type plants" have been developed and refined—and that this is the first sewage pollution suit (reported in this jurisdiction) on an alleged cause of action resulting from a nuisance which should be treated as a *permanent* nuisance if it affected plaintiffs' land near the *beginning* of the transitional period, but which due regard for scientific achievement and progress might convert, in legal concept and contemplation, into a *temporary* nuisance if it was created as to such land during the *latter part* of the transitional period. Since this opinion reflects our initial effort to delineate this expanded legal horizon which, although envisioned in earlier cases [Stewart v. City of

Springfield, supra, 350 Mo. loc. cit. 249–250, 165 S.W.2d loc. cit. 631; Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 108–109(18)], first found firm appellate recognition in the Newman case, supra, and since it is obvious that instant plaintiffs did not develop fully all factual information pertinent to their theory, the furtherance of justice impels our discretionary grant of a remand for retrial.[3]

■ Counting it unwise to circumscribe and delimit an investigation of what may be *reasonably practicable* by attempting precise legal definition of that term, and eschewing any attempt to list *all* of the factors which might bear upon reasonable practicability in a case of this character, we nevertheless suggest (in the interest of minimizing the possibility of reversible error upon retrial) that competent evidence in the following fields would be relevant to a determination of reasonable practicability, to-wit, (a) the type or character of treatment, process or plant which would abate the nuisance, (b) whether such treatment, process or plant is approved scientifically and used generally in other municipalities of comparable size, area and topography, (c) the probable cost and economic feasibility of employing such treatment or process, or of constructing such plant [see Blankenship v. Kansas Explorations, supra, 325 Mo. loc. cit. 1016, 30 S.W.2d loc. cit. 479(5, 6); annotation, 49 A.L.R.2d 253, 269–271; annotation, 40 A.L.R.2d 1177, 1187–1190], and (d) the financial ability of the municipality (but *not* the willingness of its citizens) to provide, within constitutional and statutory limitations upon the incurring of municipal indebtedness, the funds required for abatement of the nuisance. See City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208.

■ The trial court did not err in overruling defendant's motion for judgment on the pleadings, filed on the day of trial and predicated on plaintiffs' failure to file a reply to defendant's amended answer, because said answer did not contain "a counterclaim denominated as such" and the court had not ordered a reply.[4] Furthermore, the case was tried as if the new matter pleaded in said answer had been denied, so defendant could not have been prejudiced by plaintiffs' failure to reply. Section 590.100, RSMo 1949, V.A.M.S.; Hodgson v. Pixlee, Mo., 272 S.W.2d 222, 226.

Defendant's instruction D properly was refused in the form and language offered. Newman v. City of Marceline, 222 Mo. App. 980, 983, 6 S.W.2d 659, 660(4). We need not discuss other instructions offered by defendant, which should be redrafted upon retrial.

The judgment for plaintiffs is set aside and the cause is reversed and remanded for further proceedings not inconsistent with this opinion.

McDOWELL and RUARK, JJ., concur.

3. Homfeld v. Wilcoxon, Mo., 304 S.W.2d 806, 811(6, 7); Houfburg v. Kansas City Stock Yards Co. of Maine, Mo., 283 S.W.2d 539, 546–548; Kramer v. Johnson, 361 Mo. 1085, 238 S.W.2d 416, 423(13); Barnhart v. Ripka, Mo.App., 297 S.W.2d 787, 792(11); Local Finance Co. v. Charlton, Mo.App., 289 S.W.2d 157, 162 (10).

4. Section 509.010, RSMo 1949, V.A.M.S.; George F. Robertson Plastering Co. v. Magidson, Mo., 271 S.W.2d 538, 539; Smyth v. City of St. Joseph, Mo.App., 297 S.W.2d 578, 581. Contrast: Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751; McIntosh v. Foulke, 360 Mo. 481, 228 S.W.2d 757.