James F. RUPPEL and Hester S. Ruppel, (Plaintiffs) Respondents,

v.

RALSTON PURINA COMPANY, a Corporation, (Defendant) Appellant.

No. 52118.

Supreme Court of Missouri, Division No. 1.

Jan. 8, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 12, 1968.

Spencer, Hines & Petri, Columbia, for plaintiffs-respondents.

John C. Kibbe, California, J. A. Fraser and F. W. Schwarz; St. Louis, for defendant-appellant.

WELBORN, Commissioner.

This is an appeal by Ralston Purina Company from a judgment, entered on a jury's verdict, awarding James F. Ruppel and Hester S. Ruppel actual damages of $25,000 and punitive damages of $15,000 for injury to their property resulting from the operation of Ralston Purina's turkey processing plant in the City of California, Missouri.

In 1955, James F. Ruppel and his wife, Hester, purchased a 94-acre tract of land, lying east of California, for $8500. Mr. Ruppel is a brick mason and he has from time to time built houses for sale. His idea in purchasing the property was eventually to develop it for residential purposes. In 1961, 40 acres of the tract lying alongside and north of the Missouri Pacific Railroad tracks were sold to the City of California for $13,600. Mr. Ruppel knew at the time that the city proposed to use the land for industrial purposes, although the exact use proposed was not known.

In November, 1962, Mr. Ruppel began construction of a house on the 54-acre tract remaining. Mr. Ruppel did the work himself and completed a house which served as the residence of the Ruppel family which included five children. Ruppel valued the completed house at "around $11,500."

In April, 1963, construction began on the 40-acre city-owned tract of a plant to be occupied by Ralston Purina for processing turkeys. The plant was financed by municipal revenue bonds and leased to Purina. The cost of the project was in excess of $4,000,000.

The primary function of the operation of the plant is the killing of live turkeys, trucked to the plant, and the processing of the carcasses for human consumption. The plant is designed to handle approximately 350,000 pounds of live weight birds per day or a maximum of some 20,000 birds. The killing operation is seasonal, starting in late spring or early summer and ending around the last of the year. During periods of peak production in late summer, two shifts are required to handle the operation. The packing operation is year-round. When the plant first began operation, in September, 1963, approximately 200 persons were employed. At the peak of production, almost 500 persons are employed, and at the time of the trial of the case (December, 1965), 400 persons were employed.

In addition to the facilities for killing and preparing the birds for human consumption, the plant includes facilities for handling the waste products incidental to the killing and packing. The byproducts plant began operation in June, 1964. Generally, two categories of waste are processed. The first is the feathers, which are removed from the birds mechanically and are transported in water through a flume to the feather reel in the drying, or byproducts plant. The water is separated from the feathers in the reel and the feathers are transferred to a cooker where they are "hydroized" under high temperature steam and then cooked. After cooking the feathers are dried and ground into a mealy substance.

The second category of waste consists of the remaining inedible portions of the birds, such as heads, feet and entrails. These parts are also conveyed from the processing plant to the byproducts plant in water. They are removed from the water and cooked, also producing in the end a mealy substance. The end product of the processing of both types of waste is used in pet and poultry foods manufactured by Ralston Purina.

Operation of the plant involves the use of large quantities of water, some 70 gallons per bird. To handle the waste at the plant, the City of California constructed three sewage lagoons in the vicinity of the

plant and on the 40-acre tract obtained from the Ruppels. The lagoons are located near the road which runs east and west and divides the Ruppels' land from the city-owned land. The easternmost lagoon is some 400' to 500' from the Ruppel house. The second lagoon is directly south some 300' from the Ruppel house. The third lagoon is to the west of the second. The lagoons have a total area of approximately 18 acres. The waste water from the by-products plant flows into the first and second lagoons. Sanitary sewage from the processing plant also flows into the No. 2 lagoon. No. 1 lagoon drains into No. 3, as does the No. 2 lagoon. From the No. 3 lagoon, the effluent flows through a 12-inch line for some 3600' where it is discharged into a dry ditch.

The plans for the lagoon sewage treatment facilities were prepared by Mr. Clifford Smith, an engineer who had been employed by Ralston Purina for some twenty years and who had handled the company's sewage problem for 15 or 20 years. The construction of the lagoons was done on behalf of the City of California by its mayor. Problems with rock encountered during the construction reduced the area of the lagoons from approximately 25 acres as planned to 18 acres. The land on which the lagoons are located is not leased to Ralston and the operation and maintenance of the lagoons are the responsibility of the city.

Plaintiffs' petition in this action, filed in August, 1964, charged that odors generated at the plant, loud and unusual noises caused by crying fowls, flies and insects resulting from the accumulation of filth, the flow of waste water from the plant onto plaintiffs' land, and the improper design and use of the sewage lagoons which caused the contamination of the plaintiffs' well constituted a nuisance. Although there was evidence concerning the noise, plaintiffs' verdict-directing instruction submitted the unreasonable use by defendant of its property to plaintiffs' damages as: "(a) Ill-smelling odors escaped from the premises used by Ralston-Purina onto the Ruppels' property, and (b) Ralston-Purina Company deposited quantities of waste materials into the sewage disposal system in excess of the capacity of the system, and (c) Large quantities of bugs were bred at the sewage disposal system, and such bugs came onto the Ruppels' property, and (d) Ralston-Purina Company deposited waste materials into improperly designed sewage lagoons and thereby caused contaminated water to escape from the sewage lagoons onto the Ruppel property."

On this appeal, appellant's assignments of error are limited to charges that the trial court erred in submitting plaintiffs' case as one for damages for a permanent nuisance and in submitting the issue of punitive damages. We need consider only such further facts as bear upon these issues.

Plaintiffs' evidence, substantiated in varying degrees by that of the defendant, was that unbearably foul odors were produced by the sewage lagoons and the operation of the byproducts plant. Appellant does not question the sufficiency of the evidence to support a finding of a nuisance by reason of such conditions. Appellant does contend that whatever deficiency might have existed in the plant and its operation was remediable and abatable. Therefore, according to appellant, submission of plaintiffs' claim for damages for a permanent nuisance was erroneous.

The issue here presented being one of submissibility, we, of course, must examine the evidence in the light most favorable to plaintiffs. So viewed, the evidence showed that odors from the lagoons persisted at the time of the trial. The persistence of such odors, in spite of the defendant's efforts to rectify the condition would support a finding that the nuisance was permanent and unabatable. There was testimony that sewage lagoons, properly constructed and properly operated, would not produce offensive odors. However, plaintiffs' witness, Paul Decker, Chief of

Designs and Construction and Operation of the Missouri Water Pollution Board, testified that 5% of the lagoons under the jurisdiction of that agency do have odors. There was testimony in this case that defendant and the city had taken certain steps to reduce the odor output of these lagoons. For example, the defendant had installed a clarifier in the line in which waste flowed from the byproducts plant to the lagoons. This device was designed to reduce the volume of solid waste which flowed into the lagoons. However, plaintiffs' evidence was merely that the clarifier would "help" and might increase the capacity of the lagoons by 15%. In view of such evidence, the jury certainly would not be required to find that the clarifier would certainly eliminate the odors.

■ As appellant points out, there was evidence that some of the known sources of lagoon odors could be remedied. For example, there was testimony that the freezing and thawing of lagoons causes odors and that such situation may be remedied by the use of sodium nitrate. There was testimony that the accumulation of solid materials in weeds and grass along the banks of lagoons produced odors and that that condition could be remedied by keeping the banks free of weeds and grass. However, there was also testimony from defendant's expert witness that lagoons, even though properly constructed and operated, may give off unpleasant odors under cloudy and overcast weather conditions. Mr. Decker testified that he knew of no preventive measure which would prevent odors in such circumstances. Decker further stated that "any sewage treatment facility will have odors of short duration." Whether the nuisance produced by the sewage lagoon odors was a permanent one was clearly a factual issue, to be determined by the jury.

The same conclusion is reached with regard to the odors produced by the byproducts plant. Again plaintiffs' evidence showed that such odors persisted until the time of trial. Defendant testified that various steps had been taken to alleviate the situation, but in view of the evidence of the persistence of the odors, the jury could find that the condition was permanent and not abatable.

On the insect situation, plaintiffs' evidence showed large quantities of mosquito-like insects were produced at the lagoons and that they invaded the plaintiffs' property in large numbers. Mrs. Ruppel identified a quantity taken from the window of her residence in June, 1965. Again, there was evidence that proper maintenance of the lagoons by keeping weeds and grass off the banks and the use of insecticide would prevent infestation by insects of the lagoon area. However, the situation did persist and, according to defendant's expert witness, the cause of flies around lagoons is unknown. The permanency of this source of nuisance was submissible on the evidence presented.

Appellant cites three cases in support of its contention that the evidence did not warrant submission of damages as for a permanent nuisance. All three, Flanigan v. City of Springfield, Mo.Sup., 360 S.W. 2d 700; Shelley v. Ozark Pipe Line Corporation, 327 Mo. 238, 37 S.W.2d 518, 75 A. L.R. 1316, and McCracken v. Swift & Co., 212 Mo.App. 558, 250 S.W. 953; Mo.Sup., 265 S.W. 91, involved claims for damages for temporary nuisances. None provides an exact precedent for this case. McCracken did involve a poultry and egg establishment, but the issue decided was the proper measure of damages for a temporary or recurrent nuisance. Shelley v. Ozark Pipe Line Corporation involved a leaking oil pipe line. Appellant relies upon language in that case indicating that a temporary nuisance involves negligence. However, plaintiffs in this case did not rely upon negligent acts of the defendant as the basis of their complaint and the evidence does not show, as a matter of law, that the invasion of the plaintiffs' property was the result of negligence of the defendant. Flanigan v. City of Springfield in-

volved the right of a landowner to sue for damages for a temporary nuisance resulting from operation of a sewage treatment facility. The court in Flanigan held that, in view of the testimony of the defendant's witnesses about the possibility of odor-free operation of the plant in the future, "it was a jury question whether it was scientifically possible and reasonably practicable for defendant to have so operated its plant that foul and noxious odors would not have escaped therefrom." 360 S.W.2d 1. c. 704 [5]. Flanigan might well support the submissibility, particularly on defendant's evidence here, of plaintiffs' claim in this case as for damages for a temporary nuisance. However, plaintiffs elected to submit their claim as one for a permanent nuisance and defendant offered no instruction which would have presented to the jury the issue of permanent or temporary nuisance. Flanigan does not preclude the submission of plaintiffs' claim as based upon a permanent nuisance. In fact, Flanigan's major significance, insofar as this case is concerned, is its recognition of the rule, theretofore enunciated by the Springfield Court of Appeals in Newman v. City of El Dorado Springs, 292 S.W.2d 314, and Hillhouse v. City of Aurora, 316 S.W.2d 883, that a municipal sewer system is not inevitably, necessarily and inherently a permanent nuisance, " 'except the lands in the vicinity thereof and such as will, in reasonable contemplation, be permanently affected by it.' "

The evidence in this case would warrant a finding that improvements in the operation of the plant and the sewage lagoons did not and would not terminate the interference with plaintiffs' enjoyment of the use of their property and, in view of the factors which would be arrayed against judicial abatement of the operations resulting in the nuisance, the trial court was, on the facts, justified in submitting the case as one for damages for a permanent nuisance. We may here note that defendant makes no objection to the legal basis of plaintiffs' right to damages as for a permanent nuisance in this case, defendant's case on appeal being limited to the question of whether the evidence showed conclusively and as a matter of law, that the situation was remediable and abatable. Nor does defendant, on this appeal, in any manner make an issue based upon the city's responsibility for the operation of the sewage lagoons.

Related to the appellant's first contention is a second assignment charging error in the court's giving of plaintiffs' instruction on damages and refusing two instructions offered by defendant. The error in giving plaintiffs' instruction is based upon the contention that there was no evidence to justify submission of future damages. We have already answered this contention.

As for the defendant's offered instructions, they would, alternatively, have limited damages to those sustained up to the filing of suit, or the time of trial. Although these instructions would have properly limited the time for which damages for a temporary nuisance might be recoverable (see Thompson v. Hodge, Mo. App., 348 S.W.2d 11, 15[9, 10]), the defendant's instructions would not have required the jury to make the requisite finding, in view of plaintiffs' election to stand on a claim for damages resulting from a permanent nuisance, of the abatability of the nuisance. Defendant's offered instructions would, in effect have declared, as a matter of law, that the nuisance was a temporary one. We have previously demonstrated the fallacy of this theory in the present case.

■ On the issue of punitive damages, the right to recover such damages for a nuisance is established. Vaughn v. Missouri Power & Light Co., Mo.App., 89 S. W.2d 699; Schumacher v. Shawhan Distillery Co., 178 Mo.App. 361, 165 S.W. 1142; Krebs v. Bambrick Bros. Const. Co., 144 Mo.App. 649, 129 S.W. 425. In this case, plaintiffs submitted the issue by MAI No. 10.01, accompanied by the definition of legal malice found in MAI No. 16.01, as

"the doing of a wrongful act intentionally without just cause or excuse." Appellant contends that the evidence did not justify such submission because there was no showing of "ill will, bad motive, wantonness, or reckless disregard of others." Again, the issue is one of submissibility, requiring consideration of the evidence in the light most favorable to the trial court's action.

The mere erection and operation of defendant's plant were not shown to have overtones of disregard for the rights of surrounding landowners. There was no showing what defendant's experience had been with similar operations elsewhere. There was, on the other hand, evidence that sewage lagoons do not necessarily give off offensive odors and nothing to show that such situation might not reasonably have been anticipated here. Likewise, there was no showing what the experience had been in the operation of plants, if there were any, similar to that here involved.

There was evidence that complaints were made to defendant about odors after the operation began. However, plaintiffs, having taken the position that the conditions causing damage to their property were permanent and unabatable, are hardly in a position to contend that delay in taking steps aimed at remedying the situation evidences bad faith on the part of defendant. In Vaughn v. Missouri Power & Light Co., supra, the court held that failure to remedy, after complaints, an easily remediable situation justified the imposition of punitive damages. Plaintiffs here cannot, in this respect, claim to occupy a position similar to that of plaintiff in Vaughn.

■ There is, however, one aspect of defendant's operation which would, in our opinion, support the submission of the punitive damages issue. As previously stated, the plans and specifications for the sewage treatment lagoons were prepared by defendant's engineer. Plaintiffs' witness

Decker testified that the maximum loading of the facilities as constructed and operated was 1,120 pounds of B.O.D. (biochemical oxygen demand) and that the Water Pollution Board's construction permit called for such capacity. Decker testified that, in fact, the operating load was in excess of twice the design capacity and that, had he known that the actual operation involved such an overloading, an operating permit for the facility would not have been issued. According to Decker, such overloading "could lead to odors and nuisances." The overloading could have been found to have been attributable to the fact that the design capacity was intended to handle approximately 11,000 birds per day, using 50 gallons of water per bird, whereas actual operation involved killing as many as 20,000 birds, requiring 70 gallons of water per bird.

Defendant did not dispute Decker's testimony that the lagoons were overloaded by more than twice the capacity determined by the Water Pollution Board, although defendant did dispute the Pollution Board's criteria for determining the capacity of the system and contended that it could handle a far greater volume than fixed by the construction permit. Certainly the jury could have found such overloading and we are here concerned only with the question of whether plaintiffs' evidence justifies a finding of a wrongful act, done intentionally without just cause or excuse, by defendant, to plaintiffs' injury. On this appeal, defendant answers plaintiffs' claim based upon the overloading charge on the grounds that the state Water Pollution Board had taken no action based upon the alleged overloading. Other than Decker's statement, that he would not have recommended an operating permit on the basis of the operating load, the record is silent as to any official action by the Board. However, the inaction of that agency would not necessarily justify the defendant's operation or prevent the jury's finding that the conduct of defendant in this particular re-

gard was such as would call for punitive damages.

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.